

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00247-CR

KIMBALL DOUGLAS HAILEY II                                      APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

Appellant Kimball Douglas Hailey II appeals his conviction for the capital

murder of E.C., a child under six years old.[1]  In eight points, Appellant asserts

---

[1]Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3613 (amended 2011) (current version at Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2012) (substituting "10 years of age" for "six years of age")).  The State waived the death penalty, and the trial court sentenced Appellant to life imprisonment without parole.  *See* Tex. Penal Code Ann. § 12.31(a)(2) (West 2011).

that the trial court erred (1) by admitting the entirety of a witness's tape recorded pretrial interview under the rule of optional completeness; (2–3) by admitting Appellant's custodial statements to a girlfriend and a Child Protective Services (CPS) caseworker; (4) by admitting Appellant's non-custodial statements to an acquaintance; (5) by denying a challenge for cause and not allowing Appellant to individually question a "biased juror"; (6) by allowing the State to ask improper commitment questions; and (7–8) by denying three jury charge instructions. We affirm.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Because Appellant does not challenge the sufficiency of the evidence to support his conviction, we set out the relevant facts in each point. For background purposes, we provide Appellant's statement of facts as follows:

> The instant trial involved the death of Appellant's girlfriend's two and a half year old son. Appellant, his girlfriend, the girlfriend's eight year old daughter and the victim lived together for a few months prior to the incident. Appellant also had another girlfriend who lived in a different area of town.
>
> On [March 29, 2009], Appellant was home with the two children while the girlfriend, hereinafter mother, was gone to work. The mother then returned home, had an argument over money with Appellant and Appellant left. The mother also left leaving the two children home alone. Appellant then returned home a few hours later and the victim stopped breathing causing him to call 911 and have the daughter speak to the operator as he blew into the victim's mouth and then left the location. Appellant had a parole violation warrant and, to avoid arrest, left the scene but remained down the street until the ambulance arrived.
>
> The victim had multiple bruises over his body, but the cause of death was a skull fracture from blunt force trauma. The State offered

2

numerous statements Appellant made to various individuals admitting to harming the child . . . . Appellant waived his rights and provided recorded statements to the police wherein he maintained his innocence. Appellant testified at trial and denied any type of abuse of the victim. [Internal record citations omitted.]

## III. APPELLATE ISSUES

### A. Admissibility of Witness Interview under Rule of Optional Completeness

In his first point, Appellant asserts that the trial court abused its discretion by admitting and publishing the entire tape-recorded pretrial interview between Fort Worth Police Detective Amy McClellan and E.C.'s mother, Laquanta Williams. The State responds that the trial court properly admitted the interview pursuant to the rule of optional completeness because the isolated statements played for the jury left the false impression that Williams's trial testimony was inconsistent with her pretrial statements. *See* Tex. R. Evid. 107. Appellant counters that the entire tape was not admissible because it exceeded the matters inquired into, interjected extraneous information, bolstered Williams's credibility, and was "highly prejudicial."[2]

---

[2]Appellant asserts that the entire interview "was without question a highly prejudicial piece of evidence against the accused." Although rule 107 is limited by rule of evidence 403, Appellant did not object at trial that the evidence was substantially more prejudicial than probative. *See* Tex. R. Evid. 403. Thus, to the extent he attempts to raise a rule 403 complaint on appeal, he failed to preserve that portion of his complaint for appellate review. *See* Tex. R. App. P. 33.1(a)(1).

**1. Relevant Facts**

Williams testified that she was the mother of two-and-a-half-year-old E.C. and eight-year-old daughter N.W. In November 2008, Appellant and Williams began dating, Appellant moved in with Williams and her two children, and Appellant began watching N.W. and E.C. while Williams went to work.[3] Williams testified that Appellant did not have a job and that she paid for everything.

Williams testified that "hell broke loose" in the middle of March when Appellant began having mood swings.[4] On March 29, 2009, Williams left for work around 6:00 a.m.; the children were asleep, and Appellant was at home. When Williams called to check on them at approximately 11:00 a.m., Appellant said he had been sleeping but that everything was okay. When Williams finished her shift around 2:00 p.m. and drove home, Appellant greeted her by "going off and cursing her and stuff" and pushing her, and Williams testified that she did not have a chance to see her children initially. Appellant told her that he needed money, that he was "sick of this shit," and that he had to "knock out" E.C. Williams testified that Appellant continued berating her and then told her to take

_____

[3]Williams explained without objection that she and Appellant had previously had a relationship in 2005 until he "got locked up." While Appellant was away, Williams dated another man and conceived E.C.

[4]Williams testified that, prior to the instant offense, she had seen bruising and other marks on E.C. She explained that Appellant offered excuses, although one time he admitted that he "snapped." Although Williams told Appellant to "keep [his] hands off [her] kids," she was not sure why she did not do anything about it. Throughout this time, Appellant indicated to Williams that he was upset with her for having E.C. with another man.

one of their computers to a pawnshop to get money for it. Williams left and returned home around 3:50 p.m., having been unable to sell the computer. Appellant was still at home but left to go to Dallas, telling Williams to get him money before he got back or he was going to beat her and her kids when he returned. Williams testified that when she checked on E.C., he was on his bed holding a towel against his forehead, and when she removed the towel, his eyes and forehead were swollen and his lip was busted. When she spoke to E.C., he sat up and did not appear to be in pain. She testified that she "didn't know what to do" but that she left E.C. and N.W. alone at home while she went to get money from friends and relatives to give to Appellant.

Around 8:00 that evening, Williams called her cell phone, which Appellant had been using. Appellant answered "in a panic mode," told her to hurry and get home, and then hung up the phone. Once home, she saw the ambulance leaving and was told her son was being taken to the hospital. Inside, she found N.W., who told her that E.C. fell in the garage. She and N.W. then drove to the hospital.

Williams testified that she spoke to Appellant while she was at the hospital and that he asked her to lie for him. Williams testified that she decided initially to tell investigators that an individual named Chris had been at the house with the children but that "[t]his was before I was even aware of what happened to my child." Williams testified that during her interview with Detective McClellan that

5

night, she provided Appellant's name and other information "[a]fter [Detective McClellan] said what she said to me."

Appellant emphasized through cross-examination that Williams had been alone with the children a portion of that day, that she had initially not checked on E.C. after Appellant told her that he had knocked him out, and that she had not taken E.C. to the hospital when she noticed his injuries. In response, Williams stated, "[E.C.] wasn't perfectly okay. But I know one thing, I didn't kill my son. No way, no how. I didn't even spank my children at all." The following dialogue then occurred:

> [Defense Counsel]: Q. Yesterday, you told the ladies and gentlemen of the jury that you never spanked your son; is that correct?
>
> [Williams]: A. Yes.
>
> Q. You remember talking to Detective [McClellan]?
>
> A. Yes.
>
> . . . .
>
> Q. And while you were talking to her, you told her, did you not, that I barely even whip my son?
>
> A. Okay.
>
> Q. So you do occasionally whip your son; is that correct?
>
> A. If it was necessary, but not really.
>
> Q. Right.
>
> A. If he's in danger or he's hurting someone, something like that. But I never really whip my children, period.

6

. . . .

Q. You told [Detective McClellan] when [your children] were bad or they needed it, I spanked their butts. Do you remember telling her that?

A. I don't remember telling her that.

Appellant then asked to play a portion of Williams's taped interview with Detective McClellan to refresh her memory, stating that "if she denies them again after hearing them, then we would offer only those portions that are impeachment for this case."[5] The State objected to "picking and choosing" statements on the tape to be played for the jury. The trial court ruled that if Appellant played a portion of the tape, the State would be allowed to play the entire tape.

On the first portion of the tape played by Appellant for the jury, Williams is heard telling Detective McClellan, "I barely even whoop my kids" and "if they do something wrong, you know, you let them know, you get on their butt; when I do whoop, I spank their butt[s] . . . ." At trial, defense counsel asked, "[T]hat's what you did? You would spank their butts?" Williams responded, "If it was

---

[5]Although Appellant argues on appeal that he only offered portions of the audio to refresh Williams's memory, he played portions of the tape to the jury. *Compare Sauceda v. State*, 129 S.W.3d 116, 121–22 (Tex. Crim. App. 2004) (holding that optional completeness is not implicated until a party attempts to have a portion of it "given in evidence"), *with Bell v. State*, No. 02-07-00166-CR, 2008 WL 4053005, at *16 (Tex. App.—Fort Worth Aug. 29, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that document used to refresh witness's memory was properly offered into evidence under the rule of optional completeness because defense counsel misquoted a portion of it and presented a visual of the misquoted portion for the jury).

7

necessary, of course. Not beat them, spank them on their bottom. Not beat them."

Later, after Williams testified that Detective McClellan did not tell her that a woman named Winter Star Butler had come over to her house the day of the offense to sleep with Appellant, Appellant played a portion of the taped interview. Afterward, Williams agreed that Detective McClellan had told her that.

Appellant also played an additional portion of the taped interview after eliciting the following testimony:

> [Defense Counsel]: Q. You remember when you were talking to Detective McClellan, she asked you if [Appellant] had ever intentionally hurt your children? Do you remember her asking you that?
>
> [Williams]: A. No.
>
> Q. [D]id you ever tell her, no, he never intentionally hurt your children?
>
> A. No.
>
> Q. He may have slapped the boy or something during potty training?
>
> A. Slapping? I know he used to hit him. If he had a[n] accident, he did that.
>
> . . . .
>
> (A portion of interview is played.)
>
> [Defense Counsel]: Q. Did you hear the statement you made to Detective McClellan?
>
> A. Yes, I did.

8

Q. And you told her that, no, he didn't ever -- he wasn't ever intentionally mean to your son; is that correct?

A. At the time, yes.

Q. And that was a true statement?

A. No, not really. It wasn't.

Q. She told you that, you know, you needed to be truthful with her, didn't she?

A. Right.

Q. She said if you hadn't done anything wrong, then you need to be truthful; isn't that true?

A. Right.

Q. But you are saying now that you lied to her and told her, when you told her that [Appellant] had never been intentionally mean to your children?

A. I didn't actually lie to her. But at the same time --

[Defense Counsel]: Objection. She's not -- she's answered the question --

[Williams]: I loved and cared about him.

When Appellant finished cross-examining Williams, the State asked to introduce the entire interview between Williams and Detective McClellan because Appellant had "played numerous portions from it, and we'll ask that we be allowed to play the entire tape under optional completeness and prior inconsistent statements."[6] Appellant objected that the State could admit only

---

[6]The State indicates in its brief that the prosecutor meant to say "consistent statement" rather than "inconsistent statement."

9

those portions of the interview that "relate[d] to the impeachment" and his attempts to refresh her memory; he stated that the entire tape was "not admissible" and that it was "the equivalent of a police report" and improper bolstering. The State responded that Appellant

> played words on tape to a jury, which leaves a false impression about how she said it and what she was saying. And because they left a false impression about the context of the statement, we have every right to continue to play all surrounding statements so they can understand it in context.
>
> They have attacked her credibility. Her credibility is at issue. And this tape as a prior consistent statement on the other part goes to her credibility.[7]

The trial court overruled Appellant's objections, and the State played the entire taped interview for the jury, except that the State turned off the tape at the point Detective McClellan stopped the interview and a CPS worker began talking to Williams.[8]

### 2. Analysis

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Sauceda*, 129 S.W.3d at 120. Under the rule of optional completeness,

---

[7]The record does not support Appellant's assertion that "[t]he State never argued admission of the entire tape as rebutting a specific false impression or distortion left with the jury."

[8]The entire tape is approximately one hour long; however, the last fifteen minutes of the tape—the conversation between Williams and a CPS worker—was not played for the jury.

10

> [w]hen part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statements which is necessary to make it fully understood or to explain the same may also be given in evidence . . . .

Tex. R. Evid. 107; *see Walters v. State*, 247 S.W.3d 204, 217–18 (Tex. Crim. App. 2007). "This evidentiary rule 'is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing.'" *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) (quoting *Walters*, 247 S.W.3d at 218). To be admitted under the rule, the omitted portion of the statement must be (1) "'on the same subject'" and (2) "'necessary to make it fully understood.'" *Id.*; *Sauceda*, 129 S.W.3d at 123 (quoting Tex. R. Evid. 107).

Whether the taped interview was "on the same subject" is a close question. Generally, the taped interview was "on the same subject" in that it consisted of Detective McClellan asking Williams about her relationship with Appellant and Appellant's relationship with E.C. and N.W. in an attempt to investigate the offense.[9] *See Pena*, 353 S.W.3d at 814 ("The audio portion of the videotape memorializes the conversation between Appellant and [the police officer]. Hence, the audio is on the same subject as other statements introduced into

---

[9]Williams and Detective McClellan are the only people who made statements on the portion of the tape that was played for the jury, except for an unidentified voice at the beginning of the tape asking about the sign on the door of the interview room.

11

evidence."). However, the taped interview also contained statements that—although elicited in the context of Detective McClellan's attempts to determine what happened to E.C.—could be construed as extraneous information or bad acts. We have identified the arguably objectionable portions of the recording, including that Appellant was "a felon" at the time of the offense, that Appellant neither had a job nor contributed financially to the household, that Appellant had been verbally abusive to Williams and had pushed her, and that Appellant had another girlfriend (in addition to Williams) at the time of the offense.[10] We do not decide, however, whether the entire taped interview was "on the same subject." Even assuming that the trial court erred by allowing the taped interview to be played in its entirety, such nonconstitutional error was harmless. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008) (error in admitting evidence is nonconstitutional error and reviewed under rule 44.2(b)).

### 3. Harm Analysis

Under rule of appellate procedure 44.2(b), we must disregard nonconstitutional error that does not affect a defendant's "substantial rights," that is, if upon examining the record as a whole, there is a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. Tex. R. App. P. 44.2(b); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 3030 (2011). If the improperly

---

[10]Appellant at no time (either at trial or on appeal) has specifically identified the objectionable portions of the recording.

12

admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such nonconstitutional error is harmless. *Id.* In making this harm determination we examine the entire record and calculate the probable impact of the error upon the rest of the evidence. *Id.* The improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."); *Stewart v. State*, 221 S.W.3d 306, 312–13 (Tex. App.—Fort Worth 2007, no pet.) (holding that trial court's error in admitting document was harmless because evidence had already been admitted without objection).

First, any extraneous information contained on the tape was cumulative of evidence that had already been introduced to the jury without objection.[11] For

---

[11]Appellant argues that the taped interview bolstered Williams's credibility. "Bolstering occurs when one party introduces evidence for the purpose of adding credence or weight to earlier unimpeached evidence offered by that same party." *Rousseau v. State*, 855 S.W.2d 666, 681 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993); *see Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009). "Regardless of whether a witness is impeached, additional evidence to the same effect is not 'bolstering' if, as here, it makes any substantive contribution or incrementally tends to further a fact of consequence." *See Briones v. State*, 12 S.W.3d 126, 129 (Tex. App.—Fort Worth 1999, no pet.). Here, the taped interview was not offered for the sole purpose of enhancing Williams's credibility. The State offered it—and the trial court could have reasonably determined that playing the entire interview was necessary—to counteract the false impression established by Appellant's cross-examination.

instance, while explaining her relationship with Appellant to Detective McClellan during the taped interview, Williams stated that she and Appellant met in 2005, that they stopped seeing each other while he "did two years in jail," and that they resumed their relationship in 2007 when he "got out." She also stated that because he was a felon it was hard for him to find a job. However, Williams had already testified at trial without objection to virtually the same information, including that Appellant had been "locked up," had been on parole and had "violated" it, and did not have a job at the time of the offense.[12]

When Detective McClellan asked Williams during the interview whether Appellant had ever been violent with her, Williams stated, "Verbal," and "He pushed me." Williams had previously testified without objection, however, that the day of the offense, Appellant cursed at her, pushed and slapped her, and threatened that if she did not get him some money he was going to beat her and her kids.

---

*See Tovar v. State*, 221 S.W.3d 185, 190–91 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Thus, the taped interview did not constitute improper bolstering.

[12]In his opening statement, Appellant's attorney stated in part that Appellant left the house . . . after N.W. called 911 "because he knew he had a warrant out for his arrest. You see, he had gone to the penitentiary for a burglary case and got his probation revoked for not reporting. And he got out on parole, he was not reporting. And they issued a warrant for his arrest." The attorney also argued, "What [Appellant] does for a living, ladies and gentlemen, is he sings rapper music. . . . He is trying to get a big hit. It ain't working too well, but he's trying."

Also during the taped interview, Detective McClellan asked Williams if Appellant was "seeing anybody else."  Detective McClellan then stated, "apparently he is," telling Williams that a woman "came knocking on your door tonight looking for [Appellant] thinking you weren't going to be there."  Williams responded that she had her suspicions about a woman named "Star."  Detective McClellan then stated, "Okay, so, you're basically busting your butt working, okay, and this house is in your name and you're paying for it, he's not working, he's sleeping with this girl at your house . . . while you're working and then he's telling you to go out and beg for money."  Williams then asked, "She's been in my house?"  To which Detective McClellan responded, "Uh huh."  However, Appellant had already played for the jury the portion of the interview from Detective McClellan's statements beginning with "Okay" and ending with "Uh huh."  Indeed, Appellant's counsel stated at trial that "[a]nything about that being the first time [Williams] knew [Winter Star Butler] was sleeping with [Appellant] in the house would be admissible."[13]

More generally, after reviewing the entire record, we conclude that there is a fair assurance that any error in admitting the entire interview did not have a substantial and injurious effect or influence in determining the jury's verdict.  *See* Tex. R. App. P. 44.2(b); *Coble*, 330 S.W.3d at 280.  Four State's witnesses described incriminating statements made by Appellant.  For instance, Butler

---

[13]During his opening statement, Appellant's attorney stated that Appellant would tell them about his "other girlfriend, Winter Butler."

15

testified that Appellant had recounted to her shortly before trial that he had punched and stomped E.C. and then had hit E.C.'s head on the corner of the sink, causing E.C. to shake, tremble, and convulse.[14]

Further, Butler's cousin, Andre Homer, testified that Appellant called him the night of the offense (after E.C. was taken to the hospital) and that Appellant had said that Butler was in jail and that "it was an accident." Appellant then called back and said "something about the baby jumped on him or something, and he pushed the baby like out of reaction. And the baby went up against the wall and collapsed." Additionally, an acquaintance of Appellant, Lafaven Adams, testified that during a cell phone conversation with Appellant the night of the offense, Appellant had told him that he had messed up and that

> he was [a]sleep and [his girlfriend's children] were making noise while he was sleep[ing], tearing up the house. And that when he got up, that he was upset. And he grabbed [E.C.] and he tossed him and then he fell. And that he went into a seizure or whatever. And that he had panicked and left the house, and he told or he instructed the little girl, [E.C.'s] sister, to call 9-1-1.

Similarly, Larry Dawn testified that he produced music, that Appellant was a rapper, and that he had been working with Appellant to make records for approximately one month before the offense. Dawn testified that Appellant called him several times the day of the offense. Later in the evening, Dawn met Appellant at a gas station, and Appellant appeared "anxious" and "[j]ust a little

---

[14]In his appellate brief, Appellant asserts, "It was during this questioning that Appellant allegedly gave [Butler] a complete confession which was the most damaging piece of evidence in this trial."

nervous really." Dawn invited Appellant to his home, and they sat down and talked. According to Dawn, Appellant kept repeating, "'I F'ed up, I F'ed up, I messed up.'" Dawn testified that when he asked Appellant what was going on, Appellant told him that he threw the little boy. Dawn explained his understanding that Appellant grabbed the boy at the top and lower portion of his body and tossed him, like a "fireman's toss." Dawn recounted Appellant's statement that "the boy flew in the air and he turned -- kind of flew over like this and landed on his back." Appellant told Dawn that he did not know if the boy hit his head but that a few minutes later the boy was still in the same place.

In addition to her testimony regarding Appellant's inculpatory statements, Butler also testified that Appellant wrote her numerous letters from jail while he was awaiting trial. Many of Appellant's letters (of which Butler read excerpts to the jury) professed his love to her and spoke disparagingly about Williams. Butler also discovered, however, that Appellant had written love letters to Williams during the same time period. Butler testified that, after Appellant made the inculpatory statements to her, he wrote her letters, expressing at different times love, anger, and regret at how he had treated her in the past. He also told her to get her "story together" with others and "expose" Williams "for the dope snorting . . . child beating whore that she is." In one letter, Appellant told Butler that she needed to testify on his behalf and do what he needed her to do.

17

Appellant testified, thereby providing his version of what occurred that day.[15] He denied injuring E.C., and he denied telling Butler, Homer, Adams, or Dawn that he injured E.C. When his attorney asked who hit or hurt E.C., Appellant stated, "It had to be [Williams], it had to be." Appellant explained, "When I left she was there. Now, if anybody came while I was gone, I don't know. I really can't speak and say this person or that person, but I know who I left with her children. I left [Williams] with her children when I went to Dallas." Appellant testified that while he was living with Williams, "she drank alcohol a lot and she was using cocaine, just pure cocaine." While he acknowledged that he never saw her doing it, he testified that he "knew" something was different due to her actions and mood swings.

On cross-examination, the State elicited the following testimony from Appellant:

> [State]: Q. [Y]ou have pretty much told this jury that, I mean, pretty much [Williams] is the main suspect, correct?
>
> [Appellant]: A. Yes, sir.
>
> Q. And if you are in jail on a capital murder charge, why would you repeatedly write [Williams] letters telling her that you love her?
>
> A. I was never told that I couldn't write anybody. . . .

---

[15]Also, Detective Dennis Hutchins testified that he interviewed Appellant for approximately three hours the day after the offense. The interview was captured on three audio tapes that were played for the jury. On the tapes, Appellant denied ever hurting E.C. but admitted to grabbing and shaking E.C. after a potty training incident. Appellant maintained, however, that he was not at the house when E.C. received the injuries that took his life.

. . . .

Q. [M]y question is: If you are not guilty of these charges and you are truly innocent and [Williams] is the one who is the main suspect, why are you writing her letters saying you love her?

A. Because I can feel free to write whoever I want to, sir.

Q. Is [Williams] framing you?

A. Yes.

Q. Okay. Let me show you what's been marked as State's Exhibit 15 which is a letter you wrote to [Williams] on December 16th, 2009. First off, what does it say on the back of the envelope?

A. I still love you. You love me, too.

Q. Okay. And I want you to read this paragraph to the jury, sir.

A. I just want you to know that I love you and I always will. You came into my life and it was never a boring moment. We had a lot of fun for real. I appreciate that.

Q. So [Williams] is framing you, but you are writing her letters saying you love her?

A. Yes, sir.

During closing argument, the State argued, "Your old lady puts a capital murder charge on you and you are in custody, are you going to write love letters to her, I don't think so." The State also argued,

[Appellant] comes in here and trashes [Williams] and tells you about cocaine use and what a horrible mother she is. And yet on the tape with Detective Hutchins he's very explicit when he says drugs aren't [Williams's] thing. [Appellant] is nothing but a boldface liar. And with two women telling them that he loves them, he's trying to do damage control.

19

The State also argued that

> [t]he evidence supports [Butler's] version, which is this man told her what he did to [E.C.] that night.
>
> And then ladies and gentlemen there is a fact of what [Appellant] told all the other people that night. All different versions of it, but all the same story, which is I'm the one who did something. Sometimes it's on accident, sometimes it's on purpose, sometime[s] it's just, well, I just didn't know what was going to happen, but it was always the same thing, but not [Williams] did something to this child . . . .

Appellant's attorney argued,

> Did you see [Williams] on the stand, and think about it? She's a mother and she has lost a child. Would a mother have somebody say I've injured your child. I've knocked your child unconscious and then go away looking for money for drugs? Come on does that sound rational? Is that something that would happen? Think about it. It didn't happen.

After examining the record as a whole, we have a fair assurance that the alleged error did not influence the jury or that it had but a slight effect. For one, Appellant testified, thereby allowing the jury to assess his credibility in comparison to the other witnesses.[16] Moreover, Appellant still challenged Williams's credibility, despite the introduction of the audio-taped interview. Also, the State introduced other evidence implicating Appellant in E.C.'s death that, at least in the case of Butler's testimony, was more damaging than Williams's audio-taped interview. Further, ample evidence supported the jury's guilty verdict. Indeed, although not a confession of guilt, Appellant does not challenge

---

[16]Appellant's attorney stated during his opening statement that he anticipated that Appellant would testify.

20

the sufficiency of the evidence establishing his guilt. *See Motilla v. State*, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002) (recognizing that overwhelming evidence can be a factor to be considered in conducting a rule 44.2(b) harm analysis). Because we conclude that any error in introducing the audio-taped interview was harmless, we overrule Appellant's first point.

## B. Admissibility of Appellant's Custodial Statements to His Girlfriend

In his second point, Appellant asserts that the trial court erred by admitting a confession he made to one of his girlfriends, Butler, while he was in custody. Appellant contends that Butler was acting as an agent of the State and was therefore required to warn him in compliance with *Miranda v. Arizona* and article 38.22 of the code of criminal procedure. He asserts violations of *Miranda*; the Texas constitution; the Fifth, Sixth, and Fourteenth Amendments; and articles 38.22 and 38.23 of the code of criminal procedure.[17] *See* U.S. Const. amends. V, VI, XIV; Tex. Const. art. I; Tex. Code Crim. Proc. Ann. arts. 38.22, 38.23 (West 2005); *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). The State responds that the trial court properly overruled Appellant's motion to suppress his inculpatory, custodial statements to Butler because she was not acting as an agent of the State when he confessed to her; therefore, Appellant's rights were not violated.

---

[17]Appellant does not distinguish between his Fifth and Sixth Amendment claims or his article 38.22 and 38.23 claims.

### 1. Applicable Law

The Fifth Amendment of the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. As a prophylactic protection of this Fifth Amendment right, law enforcement officials, before questioning a person in custody, must inform a defendant that he has the right to remain silent and that any statement he makes may be used against him in court. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

The state law corollary to *Miranda* warnings is found in article 38.22 of the code of criminal procedure, which sets out the requirements for the admission of an accused's statements, including (as raised by Appellant) the following:

> Sec. 3. (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> . . . .
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> . . . .

Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2).[18]

---

[18] Article 38.23 prohibits the admission of evidence "obtained . . . in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America . . . ." *Id.* art. 38.23(a).

The procedural safeguards of *Miranda* and article 38.22 apply to custodial interrogation by law enforcement officers or their agents. *Berry v. State*, 233 S.W.3d 847, 855 (Tex. Crim. App. 2007); *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). Private citizens ordinarily are not regarded as law enforcement officers and thus cannot engage in custodial interrogation under article 38.22. *See Oriji v. State*, 150 S.W.3d 833, 836 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). A citizen who acts as an agent of law enforcement and interrogates a person in custody, however, is "bound by all constitutional and statutory confession rules, including *Miranda* and Article 38.22." *Wilkerson*, 173 S.W.3d at 529–30. In this context, "[t]he term 'agency' denotes a consensual relationship which exists between two persons or parties where one of them is acting for or on behalf of the other." *Id.* at 529. The law does not presume an agency relationship, and the person alleging its existence has the burden of proving it. *Id.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defen[s]e." U.S. Const. amend. VI. Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements "'deliberately elicited'" from a defendant without an express waiver of the right to counsel. *State v. Hernandez*, 842 S.W.2d 306, 312 (Tex. App.—San Antonio 1992, pet. ref'd), *cert. denied*, 509 U.S. 927 (1993) (quoting *Michigan v. Harvey*, 494 U.S. 344, 345, 110 S. Ct. 1176, 1177 (1990)). There must be

23

evidence that the witness acted "pursuant to an agreement with or instructions from government officials before he will be deemed a government agent for Sixth Amendment right to counsel purposes." *Manns v. State*, 122 S.W.3d 171, 182 (Tex. Crim. App. 2003); *see Dotson v. State*, 146 S.W.3d 285, 295–97 (Tex. App.—Fort Worth 2004, pet. ref'd) (discussing *Manns* and *Hernandez*). "An individual's action will not be attributed to the State if no promises are made for that individual's help and if nothing was offered to or asked of that individual." *Hernandez*, 842 S.W.2d at 315.

### 2. Relevant Facts

At a pretrial hearing, Appellant asked the trial court to suppress his custodial confession to Butler because she was an agent of the State, she did not provide *Miranda* warnings, and Appellant did not have counsel. In response, the State offered an audiotaped recording of a conversation between Butler and investigator Michael Weber with the Tarrant County District Attorney's Office. The trial court listened to the tape (as has this court).

Additionally, Investigator Weber testified at the pretrial hearing that he contacted Butler at the lead prosecutor's request, that he interviewed her at a restaurant, and that he recorded their conversation. Weber testified that he asked Butler if Appellant had made any previous incriminating statements to her and that she responded, "No." Butler then stated that if Appellant would confess to anyone, it would be her, and Weber "immediately" responded, "[T]hat's

24

obviously not anything we're going to ever ask you to do, you understand that[?]"

To which Butler replied "yes." Weber testified that later

[Butler] again begins to question me about what she should do, if [Appellant] tells her something. And I again tell her that that's not anything we are going to ask her to do, to go talk to him, we would never do that. And she -- she presses it, says what if he does, what do I do?

. . . .

I told her you are going to have to tell the truth at trial, and we would appreciate a heads up.

When the prosecutor asked Weber if he ever instructed Butler to work on behalf of the District Attorney's Office or law enforcement to go and get information, Weber responded, "Absolutely not." Weber testified that he served Butler with a subpoena that day and that she was not happy about it.

On cross-examination, Weber testified to the following:

[Defense Counsel]: Q. When [Butler] made some statement about, well, if he would confess to anybody, he would confess to me, did you discourage her from trying to get a confession?

[Weber]: A. Yes, sir, I did.

Q. And what exactly did you say at that point?

A. At that point, my exact words are, that's obviously not anything we are ever going to ask you to do. You understand that? And she said yes.

Q. But you didn't tell her not to do it, did you?

A. At that point, I did not want her to do it and I did not want to emphasize it.

25

Q. In no way did you attempt to discourage her after you asked her about confessions, did you?

A. Oh, absolutely, I attempted to discourage her.

. . . .

Q. So you are saying we are not going to ask you to do it; is that right?

A. That's correct.

Q. Leaving her with the impression that you would still want it?

A. No, sir.

Weber testified that he told Butler, "If he hasn't told you anything by now, he's not going to tell you anything." Weber further testified that he did not hear from Butler again until she appeared for the court date listed on her subpoena, approximately one month later. When Butler arrived, she told Weber that she had visited Appellant in jail and that he told her he did it.

Butler testified at the pretrial hearing and confirmed that she met with Weber in September 2009; she testified to the following:

[Defense Counsel]: Q. Okay. What did you tell him in regards to whether or not [Appellant] made statements to you?

[Butler] A. He had not made any -- he hadn't confessed to any crimes at the time.

Q. And during that conversation, did Mr. Weber talk to you about whether or not the District Attorney's Office wanted you to go and get us a confession?

A. He did.

26

Q. What did he tell you about that?

A. That he did not need me to do that.

Q. Okay. Did he make it clear to you that the District Attorney's Office was not asking you to go and talk to [Appellant] on our behalf? Did he make that clear to you?

A. He definitely did.

Q. Okay. Was there any -- looking back now and even at that moment, did you at any point feel like the District Attorney's Office was asking you to do something?

A. No.

Butler then explained that between one and two weeks after she met with Weber, she went to see Appellant in jail, as she had done many times before. Butler testified that she had been in an ongoing relationship with Appellant and that she had decided she was going to ask him what happened to E.C. because she was a mother and needed to know. Butler testified that before Appellant made any statements to her, she asked if he "did it." She then testified to the following:

> [Defense Counsel]: Q. [W]hen you were doing that, were you thinking about telling the DA's office at that point?
>
> . . . .
>
> [Butler]: A. I was definitely going to tell on him.
>
> Q. And you knew that they wanted him to make some sort of statement or admission at that point; is that correct?
>
> A. I knew that I wanted to know. And I knew that if he told me, that I was going to tell --

Butler testified that after she talked to Appellant, she did not tell the District Attorney's Office until she went to court on her subpoena in October 2009. At this point, the trial court denied Appellant's request that Butler's testimony be suppressed.

At trial, Butler testified that she and Appellant had lived together and had been in a relationship before he moved in with Williams and her two children and that they had continued their relationship even after he moved in with Williams. Butler testified that at approximately 8:00 on the evening of the offense, she had talked to Appellant, that he was "panicky," and that he had said he thought E.C. was "dying, like he['s] not breathing." Appellant stated to her that he came home and found E.C. like that and that Williams was not home. Appellant stated that E.C. "wasn't looking right," that he "look[ed] sickly" and that when he gave him orange juice, he "just started shaking." After Appellant hung up, Butler attempted to call him back several times, and when she got through, he said that he was trying to talk to 911 and that he had to leave the house because he was on parole.

Butler met Appellant at a gas station near Williams's home where Appellant had been watching "the whole thing." Appellant told Butler that E.C. had just had an asthma attack "or something" and that he was going to be all right. Butler decided to wait at Williams's home to tell her that her son had been taken to the hospital, but as she approached the house, an officer stopped her

and took her to the Alliance for Children building for questioning. She remained at the center from 9:00 p.m. until 5:00 a.m.

When she got home, Butler spoke with Appellant on the phone and told him that the police were saying that he beat E.C. half to death and that E.C. might not make it. Appellant told her that the police were lying and that he found E.C. "like that." Appellant was arrested later that day. Butler and Appellant continued their relationship for a while, and she continued to visit him in jail, believing that he had not done anything wrong.

Eventually, Butler decided to contact Williams and let her know the things Appellant had told her. When the two women began talking, they realized that Appellant was telling them both that he loved them and that he had been lying to them both. Butler testified that as time progressed, she lost her feelings for Appellant but that she continued to visit him sporadically.

Butler testified that she met with Investigator Weber from the District Attorney's Office and that she was upset that he had served her with a subpoena because she did not want to be "any part of this." When the prosecutor asked Butler why she decided to ask Appellant about E.C. after Weber served her with the subpoena, Butler testified, "Actually, I had been trying to get [Appellant] to tell me for a while, but, I don't know, on this particular day, I just kind of put some stipulations on it." Butler explained that she told Appellant that if they were going to be a family that she "need[ed] to know some stuff." After that, Appellant looked down and told her

29

that he beat him. He was punching him. He wouldn't quit screaming. He started stomping him. And the little n[----] just started screaming real loud. And he grabbed him, hit his head on the corner of the bathroom sink, and that's when he started shaking and trembling and going into convulsions.

### 3. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). A trial court necessarily abuses its discretion if it refuses to suppress evidence that is obtained in violation of the law and that is, therefore, inadmissible. *Wilson v. State*, 311 S.W.3d 452, 458 (Tex. Crim. App. 2010).

### 4. Analysis

Appellant acknowledges that there is no evidence that Weber directly asked Butler to obtain the confession but asserts that Weber "clearly implied" it given the nature and totality of the conversation.[19] In support, Appellant

---

[19]Appellant does not argue that the state constitutional and statutory rights he cites provide greater protection than their federal counterparts, and we limit

contends that Butler "knew the investigator was saying they did not have a confession" and that although he said they were not going to ask her to obtain the confession, "he clearly did not tell her to not do the same." Appellant also asserts that "[i]t was also clear in [Butler's] mind that she wanted to help them and she went to the jail with every intent to obtain a confession and turning it over to the state."

Appellant cites no case law in support of his argument that an implied request is sufficient. *See Manns*, 122 S.W.3d at 187 (stating that in the context of the Sixth Amendment that "there is general agreement that affirmative conduct by a government official is required to convert an entrepreneurial informant into a government agent"). In any event, we note that the record does not demonstrate an implied request. The prosecutor specifically asked Butler, "[D]id you at any point feel like the District Attorney's Office was asking you to do something?" And Butler responded, "No." Nonetheless, Appellant asserts that "certain information can be discerned [on the audiotaped recording] such as the tone of the conversation as well as [Investigator Weber's] general tone of desiring a

---

our analysis accordingly. *See Escamilla v. State*, 143 S.W.3d 814, 822–24 (Tex. Crim. App. 2004) (addressing Escamilla's Sixth Amendment and article 38.22 claims as one), *cert. denied*, 544 U.S. 950 (2005). Appellant also does not argue that different standards apply in determining whether Butler was an agent under the Fifth and Sixth Amendments. So we will combine our analysis of these points. *See Hall v. State*, 67 S.W.3d 870, 874–75 (Tex. Crim. App. 2002) (holding that because Hall failed to distinguish between his rights under the Fifth and Sixth Amendments, the court would combine its analysis of these points), *vacated and remanded on other grounds*, 537 U.S. 802 (2002).

confession which prompts the witness to clearly want to help the State by obtaining one." While we have listened to the recording and do not hear indications of an implied request, many of Weber's and Butler's statements were difficult to understand; for this reason, we defer to the trial court's assessment that the recording does not constitute affirmative evidence that conflicted with Butler's testimony. *See Madden v. State*, 242 S.W.3d 504, 516 (Tex. Crim. App. 2007).

Moreover, even if the State hoped for a confession from Appellant, this is not sufficient to establish that Butler was an agent. *See Manns*, 122 S.W.3d at 185 ("[S]everal courts have expressly held that the analysis does not change even if the government is aware of the entrepreneurial inmate's self-seeking tendencies and government officials believe—or even hope—that the inmate will elicit information from the defendant."). Also, Butler's desire to help is not dispositive. *Id.* at 185 (stating that "the government does not convert the informant into a government agent by merely accepting the offered information"). Further, to the extent it could be said that Butler deliberately elicited the information from Appellant, this does not determine the agency issue. *See id.* at 182 (noting that several federal circuit courts recognize that the "agency inquiry" constitutes a separate and distinct analysis "from whether the *informant* 'deliberately elicited' [the] information" sought to be suppressed as being obtained in violation of the accused's Sixth Amendment right to counsel (emphasis added)); *see also Hernandez*, 842 S.W.2d at 313 ("It appears clear

that in examining the *Massiah*[20] line of cases that to find a Sixth Amendment violation, the statements in question must have been (1) 'deliberately elicited' (2) by a 'government agent.'").

We find the case of *Escamilla v. State* instructive. *See* 143 S.W.3d at 822. Escamilla asserted that the trial court erroneously denied his motion to suppress a custodial videotaped interview he gave to a television reporter two days after his arrest and that the admission of the tape violated the Sixth Amendment and article 38.22. *Id.* at 822. The evidence showed that the police followed their established practice in permitting the reporter to interview Escamilla in jail after he consented. *Id.* Escamilla claimed that the reporter became a state agent when he talked to a police officer before the interview, and the officer allegedly asked the reporter to get Escamilla to talk because Escamilla would not talk to the police. *Id.* at 823. The reporter testified to the following:

> [Reporter]: A. I asked [the officer], are you going to try to block me. And, he said, well no, I want you to get him to talk. He won't talk to me. Words to that [effect]. That's not [a] quote, that's, you know, what my recollection, my impression of what he said.
>
> . . . .
>
> [State]: Q. The remark that was made, how did you review that remark by him, that I hope you get him to talk or whatever the words were that he used?
>
> A. I thought he was, you know, I was still sensitive about thinking he was going to try to block the interview. And, he said, like

---

[20] *See Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964).

a laugh, a throw away, you know, he won't talk to me so, maybe, you know, maybe you can get him to confess, something like that.

. . . .

[T]hat is my recollection, is he said, he chuckled and said, hell, no, I want you to get him to confess, he won't talk to me.

. . . .

[H]e did it in a laughing way. It was not a direct order or anything.

Q. And, that was my next question. Did you take that comment by him as any kind of directions to you as to what you should do?

A. No, sir, absolutely not.

*Id.* The court of criminal appeals held that the record did not indicate that the reporter acted as a state agent when he interviewed Escamilla and stated that the officer's hope that Escamilla would incriminate himself during the interview "was not an offer to the reporter to act as a state agent and did not convert an otherwise legal interview into an illegal one." *Id.* at 824 (citing *Hernandez*, 842 S.W.2d at 312–16).

The instant record demonstrates that Butler was not acting as a state agent when she questioned Appellant—and he made incriminating statements—about his involvement in E.C.'s murder. Thus, the trial court did not abuse its discretion by admitting Butler's testimony regarding such. We overrule Appellant's second point.

34

**C. Admissibility of Appellant's Custodial Statements to CPS Investigator**

In his third point, Appellant asserts that the trial court erred by admitting statements he made to CPS investigator Emily Jandrucko while he was in custody. Appellant contends that Jandrucko was a state agent and therefore required to warn him in compliance with *Miranda v. Arizona* and article 38.22 of the code of criminal procedure. He asserts violations of *Miranda*; the Texas constitution; the Fifth, Sixth, and Fourteenth Amendments; and articles 38.22 and 38.23 of the code of criminal procedure. *See* U.S. Const. amends. V, VI, XIV; Tex. Const. art. I; Tex. Code Crim. Proc. Ann. arts. 38.22, 38.23; *Miranda*, 384 U.S. 436, 86 S. Ct. 1602.

**1. Standard of Review**

We review for an abuse of discretion a trial court's decision to admit testimony of a CPS worker when the defendant challenges the testimony under *Miranda* and article 38.22. *See Berry*, 233 S.W.3d at 856; *Wilkerson*, 173 S.W.3d at 523–24. Under that standard, we must affirm the trial court's decision to admit the testimony if the decision is within a zone of reasonable disagreement. *See Berry*, 233 S.W.3d at 858; *Moore v. State*, 233 S.W.3d 32, 40 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**2. Applicable Law**

The procedural safeguards of *Miranda* and article 38.22 apply to custodial interrogation by law enforcement officers or their agents. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 527. State employment does not, by itself, make

a person an agent of the State for the purpose of defining "custodial interrogation." *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 528. Different types of state employees serve different roles. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 528. Law enforcement ferrets out crime, investigates its commissions, arrests perpetrators, and gathers evidence for possible prosecution. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 528. CPS workers protect the welfare and safety of children in the community. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 528. "For the most part, CPS caseworkers, who are investigating family placement and safety matters, and police officers, who are investigating criminal matters, run on separate parallel paths." *Wilkerson*, 173 S.W.3d at 529. "'[I]f the once-parallel paths of CPS and the police converge, and police and state agent[s] are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be necessary.'" *Berry*, 233 S.W.3d at 855 (quoting *Wilkerson*, 173 S.W.3d at 529).

Courts must examine the entire record to determine if the paths of CPS and the police are parallel or if they have converged in a particular case. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 530. Central to this evaluation are the relationship between the police and the potential police agent and the actions and perceptions of the police, the CPS worker, and the defendant. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 530. The essential inquiry is whether the custodial interview was conducted explicitly or implicitly on behalf of the police for the purpose of gathering evidence or statements to be used in a later

criminal proceeding against the interviewee. *Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 531. The law does not presume an agency relationship, and the person alleging such a relationship bears the burden of proving it. *Wilkerson*, 173 S.W.3d at 529.

### 3. Relevant Facts

At trial, Appellant asked the trial court to exclude the testimony of Jandrucko regarding inculpatory statements he made to her because those statements were alleged to have been obtained in violation of his Fifth and Sixth amendment rights. The trial court conducted a hearing outside of the jury's presence during which Jandrucko testified.

During her proffered testimony, Jandrucko testified that she worked as a CPS investigator and that she met with Appellant on April 3, 2009, when he was in custody in the Tarrant County jail. Jandrucko testified that the purpose of a CPS investigation is to investigate abuse and neglect allegations and that "[i]t is a requirement and policy of the investigation to interview all principals that are listed in the case." She testified that she did not provide any *Miranda* warnings prior to talking with Appellant but that, as was her procedure, she told Appellant that there was a CPS investigation in progress and that she needed to obtain a social history. Jandrucko talked with Appellant about his social history and what happened in this case. Jandrucko testified that she was not working on behalf of anyone other than CPS when she interviewed Appellant and that no police officer or law enforcement agent told her what questions to ask.

37

On cross-examination, Jandrucko agreed that she worked for the State of Texas and testified to the following:

> [Defense Counsel]: Q. You know, do you not, that it is a crime on your part if you obtain information of child abuse and you don't report it to the police?
>
> [Jandrucko]: A. Yes, sir, I do know that.
>
> Q. So when you talk to somebody, you already know that you have to talk to the police and give them any information you receive regarding child abuse?
>
> A. That is correct, joint investigations.
>
> Q. And you were working your joint investigation in this case?
>
> A. Correct.
>
> . . . .
>
> Q. And you did, in fact, turn over all your information to the police in this joint investigation, did you not?
>
> A. Yes, sir.
>
> Q. That is always the policy of CPS, is it not?
>
> A. Yes, sir.

Shortly thereafter, Appellant asked to see any reports that Jandrucko had reviewed, and the trial court took a recess. Jandrucko then continued testifying as follows:

> [Defense Counsel]: Q. Before the break, you said you turned all of your stuff over to the police.
>
> [Jandrucko]: A. They can receive it from closed records.
>
> Q. Did you turn it over --

38

A. Not me personally, no, sir.

Q. Did anybody else with the office turn it over to the police?

A. I am not aware if they did or not. I ran a separate investigation.

Q. What happened during the break? Did you talk to the State? Did you talk to the State during the break?

. . . .

A. Yeah.

Q. You did? And they talked to you about whether or not you are an agent?

A. I'm not an agent.

Q. Did they talk to you about that?

A. No, they did not.

Q. They talked to you about what you had said?

A. Correct.

Q. And they told you some things they wanted to clarify, did they not?

A. Yes.

Q. And you clarified them the way they want you to clarify them now, did you not?

A. About joint investigations.

Q. Did you commit perjury on your first set --

A. No.

Q. -- of testimony?
A. No.

39

Q. So that testimony was true?

A. Yes, sir.

Q. And you do have a joint investigation, don't you, with the police?

A. They run their separate investigation versus ours.

Q. And you work with them?

A. I do. In the same building, yes, sir.

Q. And you work to help them in investigations where there is abuse?

A. Yes, sir.

On redirect by the State, Jandrucko testified that the Fort Worth Police Department did not have any say in how she investigated the allegations and who would have custody of N.W. Jandrucko testified that the police department did not ask her to question Appellant and that she was working independently for her own agency's purposes when she spoke with Appellant.

Following this proffer of evidence, Appellant moved to suppress Appellant's statements to Jandrucko due to violations of the Fifth and Sixth Amendments, the Texas constitution, and article 38.23. The trial court overruled Appellant's objection to Jandrucko's testimony, stating:

[Appellant's] right[s] on the Fifth and Sixth Amendment were not violated. The CPS investigator was doing an investigation that was required by her position as an investigator for [CPS].

She was not told by the police what to ask the [Appellant], nor was there any evidence presented that she was requested by the police to go and visit this [Appellant].

40

So the Court finds there was no evidence that law enforcement provided her with any questions to be asked or that she did anything that would -- that was designed to assist law enforcement. She was merely doing her job as a [CPS] investigator.

## 4. Analysis

We review the record to determine whether Appellant has met his burden to show that the paths of CPS and the police had converged such that Jandrucko was a law enforcement agent required to comply with *Miranda* when interviewing Appellant. Appellant argues that "the *Wilkerson* three tiered inquiry reflects that the relationship between the [CPS] worker and police was that they were working together, in 'joint investigations' not parallel investigations."[21] The record as a whole, however, does not support Appellant's contention.

### a. *Relationship Between the Police and Jandrucko*

The *Wilkerson* court directed courts to ask the following questions to determine whether "law enforcement [was] attempting to use the interviewer as its anointed agent":

- Did the police know the interviewer was going to speak with the defendant?
- Did the police arrange the meeting?

---

[21]We agree with the State that Appellant did not preserve error regarding his article 38.22 argument and that he fails on appeal to distinguish between the federal and state issues. Also, the trial court ruled only on Appellant's federal constitution objections. *See* Tex. R. App. P. 33.1. We limit our analysis accordingly. Additionally, on appeal, Appellant focuses on the alleged Fifth Amendment violation of his right against self-incrimination and does not separately address the alleged violation of his Sixth Amendment right to counsel as raised in the trial court; therefore, we will not address it. *See* Tex. R. App. P. 47.1.

- Were the police present during the interview?
- Did they provide the interviewer with the questions to ask?
- Did they give the interviewer implicit or explicit instructions to get certain information from the defendant?
- Was there a "calculated practice" between the police and the interviewer that was likely to evoke an incriminating response from the defendant during the interview?
- Does the record show that the police were using the agent's interview to accomplish what they could not lawfully accomplish themselves?

173 S.W.3d at 530.

Appellant asserts that Detective McClellan "solidified the fact the CPS investigation was a joint investigation with the police" when she testified that the first thing she did when she was called out on this case was to go to the Alliance for Children—"a nonprofit organization that unites the community in Tarrant County in the fight against child abuse . . . by helping to coordinate the efforts of partner agencies[, including] the Fort Worth Police Department, Child Protective Services, Cook Children's Hospital and the Tarrant County District Attorney's Office." Appellant also highlights Detective McClellan's testimony that she contacted CPS prior to going to the hospital and that she agreed on cross-examination that it was the usual mode of operation for Fort Worth to coordinate the investigation with CPS and conduct a very purposeful, coordinated investigation.

In viewing the totality of Detective McClellan's testimony, however, the *Wilkerson* questions are answered in the negative. Detective McClellan testified that she received the instant injured-child call on March 29, 2009, and that she

contacted the officers at the scene, called a forensic interviewer to interview N.W., called CPS to have a worker sent to the hospital, and went to the hospital at approximately 10:30 p.m. When she viewed E.C., he appeared to have been severely beaten. Early the next morning, Detective McClellan interviewed Williams. Williams provided a timeline (as set out in our disposition of Appellant's first point) that implicated Appellant, and she stated, "I think [Appellant] done it while I was gone" because "[he was] upset with me."[22]

Detective McClellan also testified that she interviewed Butler around 3:00 a.m. on March 30, 2009, and that afterward she prepared an arrest warrant for Appellant for serious bodily injury to a child.[23] Detective McClellan testified that after E.C. died, she obtained a second arrest warrant on April 2, 2009, for Appellant for capital murder. When asked on cross-examination when she spoke with Jandrucko, Detective McClellan stated that she spoke with Jandrucko on April 7, 2009, four days after Jandrucko's interview with Appellant. Detective McClellan testified that at no point did she ever tell Jandrucko or CPS what to do.

---

[22]Detective Hutchins interviewed Appellant on March 30, 2009. Appellant waived his rights and spoke with the detective, admitting to grabbing and shaking E.C. after a potty training incident but denying that he ever hurt E.C.

[23]Detective McClellan's investigative notes, which were introduced for record purposes in connection with a different issue, provide, "Based on the information given to detectives, including specific injuries detailed by doctors as well and their medical opinion that the injuries were caused by abuse, I prepared a probable cause arrest warrant for Injury to a Child-SBI in the name of the suspect [Appellant]."

She explained that, while the police department and CPS cooperate with one another, they conduct separate investigations.

The record demonstrates that law enforcement did not attempt to use Jandrucko as its anointed agent. Indeed, law enforcement already had a strong case against Appellant before Jandrucko interviewed Appellant, and there is no evidence that the police used the agent's interview to accomplish what they could not lawfully accomplish themselves.

### b. *Interviewer's Actions and Perceptions*

We next determine whether, under *Wilkerson*, Jandrucko believed she was acting as an agent of law enforcement by asking:

- What was the interviewer's primary reason for questioning the person?
- Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal?
- How did the interviewer become involved in the case?
- Did the interviewer help "build a case" that led to the person's arrest, or was the interviewer pursuing some other goal or performing some other duty?
- At whose request did the interviewer question the arrestee?

173 S.W.3d at 530.

In addition to her testimony outside the jury's presence, Jandrucko testified to the jury that she interviewed Appellant after interviewing Williams and Williams's mother and that she interviewed all three to obtain a social history report to determine the best placement for the remaining child, N.W. She noted that as a result of her investigation, N.W. remained in foster care. Jandrucko

44

recounted Appellant's version of the events on the day of the offense, including that he got home around 5:00 that morning, that Williams went to work and came home around 2:15 p.m., that they had "gotten into it," that E.C. was laying in the back bedroom with an ice pack on his head (although Appellant did not explain why), that Williams left to get money, that he left around 4:00 or 5:00 p.m., and that he came back around 7:00 that evening. Appellant told Jandrucko that Williams "had to get with the children occasionally" and that "the injuries could have occurred while he was -- while he had left the home." On cross-examination, Jandrucko agreed that Appellant never told her that he injured E.C.

The record reflects that Jandrucko did not assist the police in building a case that led to Appellant's arrest. *Cf. Cates v. State*, 776 S.W.2d 170, 173–74 (Tex. Crim. App. 1989) (holding that the evidence gathered by a CPS worker was instrumental to the defendant's arrest for child abuse).

### c. *Appellant's Perceptions of the Encounter*

Appellant states that Jandrucko told him she was an investigator with CPS looking into child abuse allegations. *See Wilkerson*, 173 S.W.3d at 530–31 (advising reviewing courts to ask, "[W]ould a reasonable person in defendant's position believe that the interviewer was an agent of law enforcement?").

### d. *Conclusion*

Based on the record, we conclude that the trial court did not abuse its discretion by finding that Jandrucko did not act as an "agent of law enforcement"

45

when she interviewed Appellant and by admitting her testimony about the interview. We overrule Appellant's third point.

## D. Admissibility of Appellant's Cell Phone Statements to an Acquaintance

In his fourth point, Appellant asserts that the trial court erred by admitting the testimony of an acquaintance, Lafaven Adams, regarding Appellant's admissions during a cell phone conversation shortly after the offense. Appellant contends that because Adams was in prison at the time of the conversation and because Adams was violating a state statute by possessing a cell phone in a correctional facility, Adams's testimony regarding Appellant's statements is inadmissible. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (prohibiting the admission of evidence "obtained . . . in violation of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America . . . ."); Tex. Penal Code Ann. § 38.11 (West 2011) ("Prohibited Substances and Items in Correctional Facility").

In a hearing outside the jury's presence, Adams testified that, at the time of the instant offense, he was incarcerated in a state prison prerelease facility. He testified that, although it is illegal for prisoners to possess cell phones inside a prison, he had obtained a cell phone and had sent a text message to Appellant the day of the offense to let him know his new cell phone number. That same day, Adams called Appellant because they "had a relationship based on [Appellant's] music career, and [he] was trying to help him advance it"; Adams testified that it was just happenstance that he called the same day as the offense.

46

When Adams reached Appellant, Appellant stated that he had "f[-----] up." When Adams asked him what happened, Appellant stated that he had been asleep, that N.W. and E.C. were being loud and woke him up, that he lost his temper and grabbed E.C. and threw him, and that he was in trouble.

Following the hearing, Appellant objected that his admissions to Adams were inadmissible because they were obtained in violation of the law due to Adams's illegal use of the cell phone. The trial court overruled Appellant's objection, and Adams recounted Appellant's statements to the jury.

Citing three court of criminal appeals's cases, Appellant asserts that article 38.23 "applies to [Adams] as an ordinary citizen just as it would any law enforcement officer" and that article 38.23 does not permit the admission of evidence that a private person acquired by conduct that violates a criminal law. *See Miles v. State*, 241 S.W.3d 28 (Tex. Crim. App. 2007); *Jenschke v. State*, 147 S.W.3d 398 (Tex. Crim. App. 2004); *State v. Johnson*, 939 S.W.2d 586 (Tex. Crim. App. 1996).

Citing *Miles* and *Roy*, the State responds that article 38.23 did not require suppression of Adams's testimony because the criminal prohibition against an inmate's possession of a cell phone inside a penal institution has nothing to do with Appellant's Fourth Amendment privacy interests or the Texas Exclusionary Rule. *See Miles*, 241 S.W.3d at 35–36, 44–46; *Roy v. State*, 608 S.W.2d 645, 651 (Tex. Crim. App. [Panel Op.] 1980).

Appellant is correct that the court of criminal appeals has held that article 38.23(a) "mean[s] . . . what it says: that evidence illegally obtained by an 'officer or other person' ought be suppressed." *Jenschke*, 147 S.W.3d at 400 (quoting *Johnson*, 939 S.W.2d at 588). His argument that article 38.23 does not permit the admission of evidence that a private person acquired by conduct that violates a criminal law is overly broad, however, and not supported by the case law.

In *Miles*, the court of criminal appeals explained that "[t]he Texas exclusionary rule applies to *illegal searches or seizures* conducted by law enforcement officers or 'other persons,' even when those other persons are not acting in conjunction with, or at the request of, government officials." 241 S.W.3d at 36 (emphasis added). "Only those acts which violate a person's privacy rights or property interests are subject to the state . . . exclusionary rule." *Id.* at 36 n.33 (citing *Chavez v. State*, 9 S.W.3d 817, 822–23 (Tex. Crim. App. 2000) (Price, J., concurring)). The concurring opinion in *Chavez* further explains,

> Article 38.23 does expand the Fourth Amendment exclusionary rule in that private citizens, not simply government actors, are estopped from illegally obtaining evidence against a defendant. But the underlying theory of both the exclusionary rule and article 38.23 is the same: to protect a suspect's liberty interests against the overzealousness of others in obtaining evidence to use against them. Thus, unless someone's privacy or property interests are illegally infringed upon in the obtainment of evidence, the core rationale for providing this prophylactic measure is not met and its use is unwarranted. To expand the breadth of 38.23 to any and every violation of Texas "law"—beyond those that affect a defendant's privacy or property interests—is to ignore the basic premise under which the statute was created and would lead to absurd results.

48

*Chavez*, 9 S.W.3d at 822–23 (Price, J., concurring) (footnote and citation omitted).

Here, the illegality at issue—Adams's illegal possession of a cell phone in a state prison—did not violate Appellant's privacy rights or property interests; thus, it fails the criterion for finding an article 38.23 violation. *Cf. Roy*, 608 S.W.2d at 651 (reasoning that the primary purpose of article 38.23 is to deter unlawful actions that violate the rights of criminal suspects; when the purpose of the statue that is violated is unrelated to the rights of a criminal suspect, the evidence is not obtained in violation of a law within the meaning of article 38.23). The trial court did not err by admitting Adams's challenged testimony. We overrule Appellant's fourth point.

## E. Denial of Challenge for Cause

In his fifth point, Appellant asserts that the trial court erroneously denied his challenge to veniremember 51, a deputy with the Tarrant County Sheriff's Department, because the "implied bias" doctrine required veniremember 51's dismissal.[24] Appellant also asserts that the trial court erred by not allowing the defense to privately question veniremember 51.

---

[24]Appellant exercised a peremptory challenge on veniremember 51; therefore, veniremember 51 did not sit on the jury.

### 1. Relevant Facts

During jury selection, the State asked the panel if anyone had visited or corresponded with a jail or prison inmate. After several prospective jurors responded, veniremember 51 responded as follows:

> A. [Veniremember 51]: Well, I work for the Tarrant County Sheriff's Office.
>
> Q. [State]: You're a police officer?
>
> A. Yes.
>
> Q. Do you know any individuals in the courtroom today? Do you know any of us?
>
> A. Well, I know [Appellant].
>
> Q. Okay. Anything about knowing him that would cause you a problem being able to sit on this case?
>
> A. I don't think so.

During his voir dire, Appellant did not ask any questions of veniremember 51.

Following group voir dire, the trial court explained to the potential jurors that "we are going to have to call some of you back in the courtroom for further questioning." The parties then met and agreed to strike twenty-five potential jurors. The State then advised that it had "maybe four [prospective jurors] that we have questions on. So we could probably hear those now and see if we need to talk to them." Appellant then asked that the trial court bring in for individual questioning potential jurors 4, 14, and 59, and the parties questioned them.

The trial court then asked, "Y'all make your strikes?" Appellant then stated, "I have one other issue, Your Honor. . . . No. 51, deputy sheriff has indicated to me -- we needed to challenge him. He said that he had a real problem with [Appellant]." The State responded that he said "absolutely the opposite." The trial court then stated, "I think he said he knew him through his job, is what I understood he said. But he said he did not have a problem with him. That's what I recall." After the court reporter then read back the dialogue between the State and veniremember 51, Appellant challenged him for cause. The State responded that "the Defense had adequate time to ask [number 51] any questions," and the trial court denied Appellant's challenge. Appellant then stated that veniremember 51 "has been a member of the sheriff's department and he has watched over [Appellant]. And I still see that he could possibly not be biased, as a cultural bias, Your Honor, if nothing else if he is allowed to remain on the panel." The trial court reiterated that Appellant's challenge was overruled and then stated, "I will give y'all 10 minutes to make your strikes."

When court resumed, the parties submitted their peremptory challenges to the court. At that time, Appellant asked for two additional strikes, explaining that the trial court's failure to grant his challenges to veniremembers 51 and 14 forced him to use two of his peremptory challenges on them. Appellant specifically noted, "We believe that the challenge on [veniremember 51] and the failure to allow us to ask additional information on him, and the fact that he works for the sheriff's department and has been a person that knows my client personally from

51

the jail should have been granted." The trial court denied Appellant's request for two additional peremptory challenges.[25]

## 2. The "Implied Bias" Doctrine

We initially address Appellant's contention that the trial court abused its discretion by denying his challenge for cause as to veniremember 51. Appellant does not assert that actual bias or bias as a matter of law was shown; instead, he asserts that "a finding of implied bias is appropriate because the juror was an employee of the Sheriff's Department who was responsible for holding Appellant in jail for the offense [for which] he was charged."[26]

A defendant may properly challenge any prospective juror who has a bias or prejudice against the defendant or any phase of the law upon which he is entitled to rely. *See* Tex. Code Crim. Proc. Ann. art. 35.16(a)(9), (c)(2) (West 2006). A trial court's ruling on a challenge for cause may be reversed only for an abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 128 (2011).

---

[25]Appellant noted that two "objectionable jurors," veniremembers 1 and 15, were seated on the jury. *See Sells v. State*, 121 S.W.3d 748, 758 (Tex. Crim. App.) (discussing the steps to follow to preserve error when a trial court denies a defendant's challenge for cause), *cert. denied*, 540 U.S. 986 (2003).

[26]Appellant also asserts that veniremember 51 "was a member of law enforcement who personally guarded Appellant for this crime . . . ." Although Appellant provided some record references in support of this statement, we have not been able to find witness testimony that veniremember 51 personally guarded Appellant.

We cannot say that the trial court abused its discretion by denying Appellant's challenge for cause on veniremember 51 due to a "cultural bias." The court of criminal appeals does not recognize the "implied bias" doctrine, explaining that the United States Supreme Court has "adhered to a principle, established in its precedents, that in order to obtain relief, actual (as distinguished from implied) juror bias must be shown."[27]  *Uranga v. State*, 330 S.W.3d 301, 304 (Tex. Crim. App. 2010) (*Uranga* II) ("Neither the federal nor the state constitution has been held to require an 'implied bias' doctrine."). Appellant does not discuss or distinguish the *Uranga* opinion. Instead, he relies on Justice O'Connor's concurrence in *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940 (1982), and *Morales v. State*, 217 S.W.3d 731 (Tex. App.—El Paso 2007), *rev'd*, 253 S.W.3d 686 (Tex. Crim. App. 2008).

In *Uranga*, trial was to a jury, and at the punishment phase, the State introduced several unadjudicated offenses, including an incident in which the defendant drove his car onto someone's yard to elude police. 330 S.W.3d at 302. The chase was captured on a pursuing officer's in-car camera. *Id.* When the State offered the video recording into evidence and played it for the jury, one of the jurors discovered that it was his lawn that had been damaged. *Id.* The trial court questioned the juror outside the presence of the remaining jury, and

---

[27]While the *Uranga* court rejected an implied bias doctrine when a juror's impartiality is questioned, its opinion contains language that suggests it also would not recognize this doctrine when a potential juror's impartiality is questioned. *See* 330 S.W.3d at 304–07.

53

the juror gave assurances he could be fair to the defendant. *Id.* The trial court

denied the defense motion for mistrial. *Id.* at 303. On direct appeal to the court

of appeals, Uranga argued that he was denied his right to a fair and impartial jury

under the Texas Constitution, contending that harm should be presumed from

the victim-juror's participation in assessing punishment and that error should be

found from the rejection of the motion for mistrial. *Id.* (citing *Uranga v. State*, 247

S.W.3d 375, 377 (Tex. App.—Texarkana 2008) (*Uranga* I)). The court of appeals

held that since

> neither the Texas Court of Criminal Appeals nor the United States
> Supreme Court has adopted the implied bias doctrine when it is
> discovered in the middle of a punishment trial that a juror is a victim
> of the defendant's extraneous (misdemeanor-level) conduct, we
> shall not follow Uranga's suggestion that such a doctrine must be
> applied in this case.

*Id.* at 303–04 (quoting *Uranga* I, 247 S.W.3d at 378). In agreeing with the court

of appeals that there was no trial error, the court of criminal appeals held, "We

agree that the standard of appellate review was whether the trial court abused its

discretion on the factual issue of actual bias." *Id.* at 307. The court of criminal

appeals advised:

> In the instant case, the appellant posits that this Court has
> adopted the "implied bias" doctrine in limited circumstances and
> should impute the doctrine to the juror in this case. He also argues
> that the courts below erred because, although the juror in question
> stated on the record that the incident on his lawn would not affect his
> ability to decide the case, "no admonition could effectively cure the
> bias of that juror." We do not accept either argument.

*Id.* at 306. The court of criminal appeals explained:

54

The limited case law about "implied bias" stems largely from Justice O'Connor's 1982 concurrence in *Smith v. Phillips*. After the trial of Phillips began, one of the jurors submitted an application for employment as an investigator in the District Attorney's Office. Although they had learned of this application, the prosecuting attorneys withheld the information from both the trial court and defense counsel until the trial had concluded and the appellant was found guilty of murder. . . . The Supreme Court, while "not condon[ing] the conduct of the prosecutors in this case," held that their "failure to disclose [the juror's] job application, although requiring a post-trial hearing on juror bias, did not deprive respondent of the fair trial guaranteed by the Due Process Clause." The Court adhered to a principle, established in its precedents, that in order to obtain relief, actual (as distinguished from implied) juror bias must be shown. It also held that, while prosecutorial misconduct might be relevant to the juror-bias issue, such misconduct alone would not amount to a due-process violation.

Justice O'Connor said that she "concur[red] in the Court's opinion, but wr[o]te separately to express [her] view that the opinion does not foreclose the use of 'implied bias' in appropriate circumstances." . . . . She gave an illustrative list of examples in which the "implied bias" doctrine may apply, notably referring to "extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."

. . . .

In this case, the trial court held a hearing during the trial on the issue of actual bias. We hold, in accordance with the Supreme Court's reasoning in *Smith v. Phillips*, that such a procedure was appropriate and adequate. There was no requirement of a mistrial on a theory that bias must be implied to the juror.

*Id.* at 304–06 (citations omitted).[28]

This court is bound by, and has no authority to disregard or overrule, the precedent of the court of criminal appeals. *See Lockard v. State*, 364 S.W.3d 920, 924–25 (Tex. App.—Amarillo 2012, no pet.); *Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd). Thus, in light of *Uranga*, we conclude that the trial court in the instant case did not abuse its discretion by denying Appellant's challenge for cause based on implied bias.

### 3. Limitations on Voir Dire and Proffering Proper Questions

Appellant also contends that the trial court erred by not allowing him "to pose private and very proper questions during voir dire examination of [number 51] . . . so as to not poison the panel as a whole as to Appellant's pre-trial incarceration or as to possibly inadvertently bring out any poor behavior in jail." *See Jones v. State*, 223 S.W.3d 379, 380–81 (Tex. Crim. App. 2007).

Citing *Simpson v. State*, Appellant initially asserts that the trial court was "required" to permit the defense to individually question veniremember 51. *See* 119 S.W.3d 262 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004). *Simpson* is inapposite, however, because it discusses the voir dire examination of a veniremember in a death penalty case. *Id.* at 266. Only when the State is seeking the death penalty is either the State or the defense absolutely entitled to

---

[28]*Cf. Uranga*, 330 S.W.3d at 308–10 (Price, J., dissenting) (stating that the implied bias doctrine should be applied in this case and citing Fifth Circuit opinions that recognize and apply the implied bias doctrine).

56

individually question veniremembers apart from the rest of the panel, if requested. Tex. Code Crim. Proc. Ann. art. 35.17 (West 2006). A trial court has discretion to order individual voir dire in any case, however.[29] *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005).

The gist of Appellant's argument is that the trial court abused its discretion by limiting his voir dire of veniremember 51. When an appellant challenges a trial court's limitation of his voir dire, we analyze this challenge under an abuse of discretion standard, "the focus of which is whether the appellant proffered a proper question concerning a proper area of inquiry." *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex. Crim. App. 1991), *cert. denied*, 503 U.S. 990 (1992), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995); *see Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002) ("A trial court's discretion is abused only when a proper question about a proper area of

---

[29]If requested and under the appropriate circumstances, a hearing on actual bias would be appropriate under *Uranga*. *See* 330 S.W.3d at 306. In *Uranga*, the court of criminal appeals stated the following:

> As the Supreme Court said in the *Phillips* opinion, the "Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"—not the implied bias of which Justice O'Connor wrote.

> In this case, the trial court held a hearing during the trial on the issue of actual bias. We hold, in accordance with the Supreme Court's reasoning in *Smith v. Phillips*, that such a procedure was appropriate and adequate.

*Id.*

inquiry is prohibited."). In order to preserve error as to the improper limitation of voir dire, an appellant "must show that he was prevented from asking *particular* questions that were proper." *Sells*, 121 S.W.3d at 756.

The record in the instant case does not reflect the "private and very proper questions" Appellant allegedly attempted but was not allowed to ask. Indeed, the record belies Appellant's assertions that he asked to question veniremember 51 individually, that he proffered proper questions to the trial court, that the trial court denied such a request, and that Appellant objected to the refusal. Without a record of the questions Appellant intended to ask (but was prevented from asking), we cannot determine whether the trial court should have allowed the individual questioning of Juror 51. *See Shannon v. State*, 942 S.W.2d 591, 596 (Tex. Crim. App. 1996) ("[B]ecause appellant never set out a specific question he wanted to ask, we cannot determine whether that particular question would have been proper."); *Easterling v. State*, 710 S.W.2d 569, 575–76 (Tex. Crim. App.) ("Before we can determine if the trial court has abused its discretion by improperly restricting the voir dire examination, it is necessary for the record to reflect what questions the defendant desired to ask the jury panel."), *cert. denied*, 479 U.S. 848 (1986); *McManus v. State*, 591 S.W.2d 505, 520 (Tex. Crim. App. 1979) ("In order for this [c]ourt to determine whether the parties' questions were proper questions, they must appear in the record."), *overruled on other grounds by Reed v. State*, 744 S.W.2d 112 (Tex. Crim. App. 1988).

After the panel voir dire in this case, the trial court *granted* the parties' requests to bring in three veniremembers to talk to them individually. Appellant did not request that veniremember 51 be included in this individual questioning, although he subsequently stated, "I have one other issue, Your Honor. [Number 51]." After the court and the State disagreed with Appellant's characterization of veniremember 51's statements, Appellant challenged the juror for cause without asking to question him individually. The parties were then excused "to make [their] strikes," and when they returned, Appellant stated, "We believe that the challenge on [number 51] and the failure to allow us to ask additional information on him, and the fact that he works for the sheriff's department and has been a person that knows my client personally from the jail should have been granted."

Despite the record, Appellant advises that he requested an opportunity to question veniremember 51 and that the trial court overruled this request. In a footnote, however, Appellant clarifies that "[t]he record omits a direct request to individually question the juror, but it is clear from the totality of the exchange [that] counsel had made the request of the court." Appellant relies on the fact that the trial court did not "correct" his statement that the trial court "fail[ed] to allow us to ask additional information on [veniremember 51]."

Our case law "imposes . . . [a] burden on the appealing party to make a record demonstrating that error occurred in the trial court." *Davis v. State*, 345 S.W.3d 71, 77 (Tex. Crim. App. 2011); *see* Tex. R. App. P. 33.1(a)(1), (2)(A). An "off-the-record" objection will not preserve a complaint for appeal. *Lasher v.*

59

*State*, 202 S.W.3d 292, 295 (Tex. App.—Waco 2006, pet. ref'd); *see Green v. State*, 912 S.W.2d 189, 192 (Tex. Crim. App. 1995) ("This Court does not decide cases based on speculation about matters not shown in the record."), *cert. denied*, 516 U.S. 1021 (1996). Mere assertions in a brief not supported by the record will not be considered on appeal. *Freeman v. State*, 828 S.W.2d 179, 181 (Tex. App.—Houston [14th Dist.] 1992), *pet. ref'd*, 874 S.W.2d 685 (Tex. Crim. App. 1994). While it is true that "[a] trial court's ruling on a matter need not be expressly stated if its actions or other statements otherwise unquestionably indicate a ruling," *Rey v. State*, 897 S.W.2d 333, 335–37 (Tex. Crim. App. 1995),[30] it is not obvious in the instant case that Appellant asked and was refused permission to individually question veniremember 51. *See id.* (finding preservation by implicit ruling under a record that reflected that the defendant had "twice requested the court to make a ruling and then stated for the record that the court had denied his motion. Neither the court nor the State corrected that statement").

Here, in asking for two additional peremptory challenges, Appellant stated, "We believe that the challenge on [number 51] and the failure to allow us to ask additional information on him . . . should have been granted." Although the trial court did not deny or confirm the accuracy of this statement, Appellant did not

---

[30]*See Dahlem v. State*, 322 S.W.3d 685, 691 (Tex. App.—Fort Worth 2010, pet. ref'd) ("Actions or statements of a trial court have been held to constitute an implicit ruling when they 'unquestionably indicated' a ruling . . . .").

60

definitively assert that he had requested and been denied the opportunity to individually question veniremember 51. *Cf. Davis v. State*, 104 S.W.3d 177, 179–80 (Tex. App.—Waco 2003, no pet.) (holding that when no ruling appeared on the record, defense counsel's offer of proof "for appellate purposes" and exception to the court's "ruling," combined with court's failure to contradict or correct, was sufficient to draw an "implied ruling").

Even if the record were sufficient to draw an implied ruling, Appellant did not make an offer of proof of the questions he was allegedly prevented from asking. *See Caldwell*, 818 S.W.2d at 793–94 (holding that one preserves his complaint about being unable to ask questions during voir dire by presenting the specific question to the trial court and obtaining an adverse ruling); *Gonzalez v. State*, 296 S.W.3d 620, 630 (Tex. App.—El Paso 2009, pet. ref'd) (holding that because appellant failed to cite a particular, proper question that he would have posed to the venire panel he "did not preserve this issue for review and the trial court did not err in denying his request"); *cf. Franklin v. State*, 12 S.W.3d 473, 475–77 (Tex. Crim. App. 2000).

In *Franklin*, a juror revealed for the first time during trial that she knew the complainant. 12 S.W.3d at 475–77. The trial court asked the juror if she could be fair and impartial, and she said yes. *Id.* at 475. Defense counsel moved for a mistrial and also requested to ask the juror some additional questions about her relationship with the complainant. *Id.* at 476. When the trial court refused to allow additional questioning, defense counsel objected and stated that he would

61

have asked the juror about her relationship with the complainant, how long the relationship lasted, whether or not she could set aside that relationship in deciding the case, and whether she would give more or less credence to the complainant's testimony and truthfulness due to the relationship. *Id.* Defense counsel stated that the court was preventing him from developing any testimony regarding potential biases. *Id.* The judge overruled the objections and denied the motion for mistrial. *Id.* The court of appeals held that the trial court had erred by refusing to permit questioning but that the counsel had not preserved error. *Id.* at 477. The court of criminal appeals disagreed, explaining that counsel requested that the trial court allow him to question the juror and that counsel set out proposed questions and that "[t]his ruling amounted to a direct order not to ask the questions. Therefore, appellant properly preserved the issue for review." *Id.*

Because Appellant did not proffer the questions he would have asked veniremember 51, we cannot say that the trial court abused its discretion. *State v. McGuffey*, 69 S.W.3d 654, 656 (Tex. App.—Tyler 2002, no pet.) ("When the issue concerns voir dire questions, the trial court must be on notice as to the specific question the party wanted to ask and was precluded from asking. Without a precluded voir dire question before us, there is nothing for us to review.") (citing *Franklin*, 12 S.W.3d at 477). We overrule Appellant's fifth point.

## F. Commitment Questions

In his sixth point, Appellant asserts that the trial court erred by allowing the State to ask improper commitment questions while discussing lesser included offenses with the panel. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). The State responds that the prosecutor did not violate *Standefer* because he never asked a question during the complained-of passage of voir dire.

We review a trial court's ruling on an allegedly improper commitment question during voir dire for an abuse of discretion. *Barajas*, 93 S.W.3d at 48. "'[A]n attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts.'" *Standefer*, 59 S.W.3d at 179 (quoting *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991), *cert. denied*, 510 U.S. 831 (1993)). Commitment questions "commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Id.* Although commitment questions are generally phrased to elicit a "yes" or "no" answer, an open-ended question can be a commitment question if the question asks the prospective juror to set the hypothetical parameters for his decision-making. *Id.* at 180. It is permissible to use fact-specific hypotheticals "to explain the application of the law," however, it is improper to inquire how a venireman would respond to particular circumstances as presented in a hypothetical question. *See Atkins v. State*, 951 S.W.2d 787, 789–90 (Tex. Crim. App. 1997). A trial judge must determine if the hypothetical is used to properly explain the law

63

or to improperly commit the venire to a specific result under the facts. *See id.* To find that the question was used for anything other than to explain the law would be to find an abuse of discretion and would constitute reversible error. *Id.*

Appellant challenges a portion of the State's voir dire, which is italicized below. We have included additional portions of the State's voir dire to provide context, as follows:

> Let's talk a little bit about what's called lesser included offenses. Now, what we are here on is capital murder of a child, okay? That is what this case is charged with. There are times at trial that the evidence could play out in a different fashion, and a jury could be asked to consider what's called lesser included offenses.
>
> . . . .
>
> The first lesser included offense we are going to talk about is felony murder, okay? Felony murder basically means you commit a felony and that's what you intend to do, and in the middle of it, and a murder happened.
>
> So these are the element[s] for felony murder: A defendant on or about a certain date in Tarrant County, Texas, commits injury to a child and they commit an act clearly dangerous to human life that causes death.
>
> . . . .
>
> Now, if it would play out where this would be a lesser included offense and then you get a third lesser included offense that would be injury to a child, . . . .
>
> . . . .
>
> So let's talk about injury to a child really quick. There are the elements that [co-counsel] and I have to prove to you beyond a reasonable doubt. That the defendant on or about a certain date in Tarrant County, Texas, knowingly causes serious bodily injury to a child under 15.

64

. . . .

So for injury to a child, you have to show that there is serious bodily injury. And that is a substantial risk of death or that causes death, okay?

. . . .

*Now, I want to kind of give two different examples on injury to a child. You could have a situation where you had a guy who just has a history of abusing children, okay? He has beaten his kids for years. He's caused bruises and fractures for years and years and years.*

*And let's say this guy's five-year-old just won't quit crying one day and is just acting up in the house. And the guy just says, you know what? He just loses it, and he just stomps that kid's head in, okay? He kills that child.*

[Defense Counsel]: Your Honor, I object to counsel going into specific instances, and attempting to bind the jury down on any particular fact situation. It's a violation of standard.

THE COURT: Okay. Response?

[State]: Judge, in order when we get to probation to talk about -- or not probation, punishment for injury to a child, serious bodily injury, we have to be able to show that they can consider the full range of punishment. And that's why we have to use the example at this point.

If I show the example at the point talking about punishment, he would be correct. But not at this point because we have to talk about different scenarios.

[Defense Counsel]: You cannot go into any fact situations, Your Honor, and then ask the jury, well, what are you going to do on that, which is exactly what he is doing. It's a violation of standard, and we object to that.

[State]: We're exactly allowed to give examples.

65

THE COURT:  I am going to allow him to get into examples, but not as to -- or commit in front of the jury.  So overruled.

. . . .

[State]:  So back to my example, you have a guy who is a known child abuser and he stomps the child, okay?

[Defense Counsel]: Objection, Your Honor, same words.

THE COURT:  Overruled.

[State]:  That could be injury to a child, serious bodily injury, if he causes --

[Defense Counsel]:  Objection, Your Honor.  Same objection.

THE COURT:  Overruled.

[State]:  That could be considered injury to a child, okay?  You know, if the kid has a serious --

[Defense Counsel]:  Same objection, Your Honor.

THE COURT:  All right.  I will give you a running objection.  Go ahead.

[State]:  *Let me give you another example for injury to a child serious bodily injury.  Let's say you've got a guy, his wife leaves him, he's got five kids, he loses his job, okay?  The bank is getting ready to take the house and his five-year-old just won't stop crying, okay?*

*And he reaches down, grabs that five-year-old by the arm and just throws him up so he will quit crying, okay?  Breaks the kid's arm, okay?  The kid's arm doesn't heal correct, all right?  He's deformed.  That could also be injury to a child, serious bodily injury.*

*The reason why I point out these different examples is you could have one obviously that is one of the most egregious things you've ever heard.  You could have one, even though it's not right, okay, but obviously it's not as serious as the first one.*

66

*So there is a whole range of fact scenarios that you guys can consider. And that's why I bring that up.*

On appeal, Appellant asserts that "the prosecutor was impermissibly attempting to bind or commit the prospective jurors to a verdict on the lesser offense and its punishment based upon his very specific hypothetical factual scenarios." He further contends that

> the prosecutor[']s open-ended voir dire questioning constituted commitment questioning because the prospective jurors as a whole were asked to set the hypothetical parameters for their decision making by the facts spelled out by the prosecutor who tells them one factual scenario would be egregious and the other would be not as egregious but both would be injury to a child. [Citations omitted.]

Contrary to Appellant's assertions, the prosecutor's hypothetical examples did not constitute improper commitment questions.[31] The prosecutor did not attempt to bind the veniremembers to resolve or refrain from resolving an issue on the basis of one or more facts contained in the questions. *See Halprin v. State*, 170 S.W.3d 111, 118–19 (Tex. Crim. App. 2005) (holding that hypotheticals were not commitment questions because they did not attempt to bind the prospective jurors to a certain resolution based on the hypotheticals provided);[32] *see also Daniel v. State*, No. 10-10-00061-CR, 2011 WL 941301, at

---

[31]Appellant cites us generally to *Standefer*, *Atkins*, and *Wingo v. State*, 189 S.W.3d 270 (Tex. Crim. App. 2006). None of these cases are factually similar to the instant issue.

[32]In *Halprin*, the court of criminal appeals found the following hypothetical example by the prosecution proper:

67

*1–4 (Tex. App.—Waco Mar. 16, 2011, pet. ref'd) (mem. op., not designated for publication) (discussing cases holding that hypothetical examples were not commitment questions). Thus, the trial court did not abuse its discretion by allowing the State's hypothetical examples.

In any event, any alleged error was harmless. *See* Tex. R. App. P. 44.2(b); *Sanchez v. State*, 165 S.W.3d 707, 713 (Tex. Crim. App. 2005). In *Sanchez*, the court of criminal appeals held that the "ultimate harm question is: was the defendant tried by an impartial jury, or, conversely, was the jury or any specific juror 'poisoned' by the State's improper commitment questions on a legal issue or fact that was important to the determination of the verdict or sentence?" 165 S.W.3d at 713.

Appellant asserts that he was harmed because the "panel as a whole was poisoned by the [S]tate's improper commitment questions on the legal issue and facts of what was injury to a child versus capital murder which is obviously

---

> [The] wide range of punishment recognizes the wide range of circumstances that murder can be committed under. Maybe a situation where I turn to Mr. D'Amore, I don't like his tie today, and I shoot him ten times in the head, and, you know, he falls down and, you know, I dance around all happy about it. It's a brutal, heinous, intentional murder. . . . [I]t could be something like that, that's an intentional murder. Or it could be an aged spouse, okay, who pulls the life support plug —

*Halprin*, 170 S.W.3d at 120.

68

important to the determination of guilt."[33]   The only lesser-included offense submitted to the jury, however, was criminal negligent homicide.   Thus, the lesser-included offense of injury to a child was not an option at the guilt phase. *See Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996) ("Because appellant was convicted of capital murder, any erroneous or misleading hypotheticals to prospective jurors about punishment for the lesser-included offense of murder made no contribution to appellant's conviction or punishment.").   We overrule Appellant's sixth point.

## G.  Requested Jury Instructions

In point seven, Appellant asserts that the trial court erred by denying his request for a jury instruction pursuant to article 38.23 and article 38.22, section 7 regarding the admissibility of Appellant's statements "illegally obtained" by Butler. In point eight, he asserts that the trial court erred by denying his request for a jury instruction pursuant to article 38.23 regarding the admissibility of Appellant's cell phone statements to inmate Adams.

### 1.  Standard of Review

In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends.   *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26

---

[33]We understand the prosecutor's hypothetical as explaining different situations that could constitute injury to a child rather than comparing injury to a child to capital murder, as Appellant suggests.

69

(Tex. Crim. App. 2009). If error occurred, we then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

## 2. Applicable Law

### a. *Article 38.23*

A defendant's right to the submission of jury instructions under article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible. *Madden*, 242 S.W.3d at 509–10. To be entitled to the submission of a jury instruction under article 38.23(a), a defendant must establish that (1) the evidence heard by the jury raises an issue of fact; (2) the evidence on that fact is affirmatively contested; and (3) the contested factual issue is material to the lawfulness of the challenged conduct in obtaining the evidence. *Id.*; *see also Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008). "The cross-examiner cannot create a factual dispute for purposes of an Article 38.23(a) instruction merely by his questions. It is only the answers that are evidence and may create a dispute." *Madden*, 242 S.W.3d at 514 (footnote omitted).

### b. *Article 38.22, Section 7*

Article 38.22, section 7 requires a trial court to include an instruction in the jury charge when the evidence raises a genuine factual dispute regarding whether a defendant "was adequately warned of his rights and knowingly and intelligently waived" those rights. *Oursbourn*, 259 S.W.3d at 176, 180. In other words, *if* the defendant made his statement as the result of custodial

70

interrogation, he is entitled—when the issue is raised by the evidence—to have the jury decide whether he was adequately warned of his rights and knowingly and intelligently waived these rights. *Id.* at 176. Section 7 of article 38.22 provides that "[w]hen the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." Tex. Code Crim. Proc. Ann. art. 38.22, § 7. "The phrase 'the issue' refers to compliance with the statutory warnings set out in both Articles 15.17 (Duties of Arresting Officer and Magistrate) and 38.22, §§ 2 & 3, and the voluntariness of the defendant's waiver of the rights." *Oursbourn*, 259 S.W.3d at 176.

### 3. Application of Law to Facts

#### a. *Appellant's Confession to Winter Star Butler*

Appellant asserts that "[f]rom a totality of the facts, it is clear that there is at least a modicum of evidence, even if incredible, that raises the factual issue of whether [Butler] was acting as an instrumentality or conduit for the prosecution when she obtained Appellant's confession." He contends that the recorded conversation between Butler and Investigator Weber (as discussed in Appellant's second point) "raises the factual issue requiring the jury charge." He states that "certain information can be discerned such as the tone of the conversation as well as the [DA] investigator's general tone of desiring a confession which prompts the witness to clearly want to help the State by obtaining one." He also asserts that "[t]here is a factual dispute from the testimony," reiterating as he did

in his second point that "[a]lthough the district attorney's investigator did not directly ask her to try to obtain the confession, it was clearly implied given the nature and totality of the conversation."

### (1) Article 38.23

Generally, "an [a]rticle 38.23 instruction must be included in the jury charge only if there is a factual dispute about how the evidence was obtained." *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004); *see Madden*, 242 S.W.3d at 510 ("If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law.").

At trial, Appellant stated,

> We would ask for a 38.23 instruction, Your Honor, as being an agent of the State. If the Court and jury could -- [we'll] define that Winter Star Butler was an agent of the State when she went up and attempted to allegedly get a statement. The statement she denies was ever made, but *she testifies that it was made that she was acting of and at the winking insistence or request of the State* and looking at the testimony and the statements contained within Winter Star Butler's interview by the DA's investigator I believe we are entitled to a charge. [Emphasis added.]

Appellant did not submit a proposed jury instruction. We construe Appellant's statements as a request that the jury determine whether Butler was acting as an agent of the State when she confronted Appellant in jail.

The evidence, however, did not raise any affirmatively disputed factual issue concerning whether Butler was an agent. Despite Appellant's characterization of Butler's testimony, Butler responded "no" when the prosecutor specifically asked her, "[D]id you at any point feel like the District Attorney's

72

Office was asking you to do something?" When the prosecutor asked Butler her reasons for questioning Appellant, Butler testified to the jury that she "had been trying to get him to tell [her] for a while" because she wanted to know and that she told him, "[I]f we're going to be [a] family, I need to know some stuff." Although Appellant vigorously cross-examined Butler regarding her meeting with Weber in an effort to suggest Weber had encouraged Butler to coerce Appellant's confession, Butler consistently disagreed with Appellant's assertions.[34] Appellant brought forth no independent affirmative, factual evidence—beyond his mere unsuccessful cross-examination arguments—that disputed Butler's testimony.

Appellant asserts that the recorded conversation between Investigator Weber and Butler, which was played for the jury, raised a factual dispute as to the issue of agency because "certain information can be discerned such as the tone of the conversation as well as the [DA] investigator's general tone of desiring a confession which prompts the witness to clearly want to help the State by obtaining one." As previously stated, we defer to the trial court's assessment that the recording did not constitute affirmative evidence that conflicted with Butler's testimony. *See Madden*, 242 S.W.3d at 516.

Because there was not an affirmative, factual, and material dispute with respect to how Butler elicited Appellant's statements, Appellant was not entitled

---

[34]Investigator Weber did not testify before the jury; he only testified during pretrial proceedings.

73

to an article 38.23 instruction concerning whether Butler was an agent of law enforcement.

## (2)  Article 38.22, section 7

As the State notes, Appellant offers no "meaningful analysis" regarding article 38.22.  In addition, the record demonstrates that Appellant was not entitled to an instruction under article 38.22, section 7.   An instruction is required under this provision if the defendant made his statements as a result of custodial interrogation and if the evidence raises a factual dispute regarding whether a defendant "was adequately warned of his rights and knowingly and intelligently waived" those rights.  *Oursbourn*, 259 S.W.3d at 176, 180.  In addition to the trial court's ruling that Appellant's admissions to Butler did not stem from custodial interrogation, which we have upheld, the parties agreed that Butler did not provide any warnings to Appellant before she asked him about E.C.; therefore, there was not a fact issue as to whether Appellant was adequately warned and knowingly waived his rights.

## b.  *Appellant's Statements to Lafaven Adams*

In point eight, Appellant asserts that the trial court erred by denying his request for a jury instruction pursuant to article 38.23 regarding the admissibility of Appellant's cell phone statements to inmate Adams.  Appellant asserts that "[f]rom a totality of the facts, it is clear that there is at least a modicum of evidence, even if incredible, that raises the factual issue of an illegally obtained statement."  As the record demonstrates, however, only a legal—rather than a

74

factual—dispute existed at trial and, therefore, an article 38.23 instruction was not required. *See Madden*, 242 S.W.3d at 509–10 ("A defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible.").

As set out in our discussion of Appellant's fourth point, the evidence was uncontroverted that Adams was talking with Appellant on a cell phone that Adams illegally possessed while in prison when Appellant made incriminating statements to him during their conversation. Appellant's own argument on appeal demonstrates that there was not a fact issue:

> [Adams] unequivocally stated that he was in a pre-release prison facility, he was not allowed to have a cell phone and he was using it illegally when he called Appellant and obtained his admissions. He admitted his use of the cell phone in the penal institution was a crime. Further, the State fully conceded that the witness was committing a crime when he used the phone to call Appellant. [Record citations omitted.]

Indeed, after Adams testified outside the presence of the jury, Appellant argued that Adams's testimony should be excluded under article 38.23 because "the information was obtained as a result of a violation of the law." The State agreed that Adams "was breaking the law by possessing a cell phone" but argued that article 38.23 "doesn't apply in this type of situation." Because a legal—rather than a factual—dispute existed at trial, an article 38.23 instruction was not

75

required.[35] *See Madden*, 242 S.W.3d at 510 ("If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law."). The trial court properly denied Appellant's request to include the article 38.23 jury instruction in this instance. For all of the above stated reasons, we overrule Appellant's seventh and eighth points.

## IV. CONCLUSION

Having overruled Appellant's eight points, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MCCOY, and GABRIEL, JJ.

PUBLISH

DELIVERED: October 18, 2012

---

[35]Appellant did not present a proposed jury instruction to the trial court at the charge conference, and he does not set out on appeal the instruction he argues should have been given. In his related point number four, Appellant asserted that his admissions to Adams were inadmissible because they were illegally obtained through Adams's illegal use of the cell phone.