**Opinion issued May 27, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00399-CR

———————————

**JAMES DANIEL GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 506th District Court**
**Grimes County, Texas**
**Trial Court Case No. 18135**

---

## MEMORANDUM OPINION

A jury convicted appellant James Daniel Green of murder and, after finding the allegations in two enhancement paragraphs true, assessed his punishment at life imprisonment. In five issues, Green argues the trial court abused its discretion by (1) denying his motion to suppress certain statements he made to his alleged

common-law wife, Mary Mariah Craig, and law enforcement; (2) admitting jail phone calls between Green and Craig even though the sponsoring witness did not have personal knowledge concerning maintenance of the phone records and was not the custodian of records; (3) admitting transcripts of the phone calls between Green and Craig; (4) allowing the State's forensic dental identification expert to testify about the decedent's dental records and include them in a demonstrative exhibit; and (5) allowing Craig's counsel to represent her during Green's murder trial even though her counsel had once represented Green in a separate criminal case that the State was using to enhance Green's punishment range in this case.

We affirm the trial court's judgment.

## Background[1]

The decedent, Jason Currie ("Currie"), went missing on June 25, 2016. A few days before his disappearance, Currie accidently pocket-dialed Colton Manning's ("Manning") cell phone. Appellant James Daniel Green ("Green"), who was with Manning when Currie called, overheard Currie tell another man that he was planning to steal three ounces of methamphetamine from Green.

---

[1] Appellant James Daniel Green was charged with and later convicted of Jason Currie's murder. Green moved to suppress statements he made to his alleged common-law wife, Mary Mariah Carey, and law enforcement. The background section is based on testimony elicited during the motion to suppress and during trial.

Unaware that Green had overheard the prior conversation, Currie called Green on June 25, 2016, to arrange a purported drug purchase. Currie and his friend, Mike Melson ("Melson"), met up with Green and Manning at Green's home that afternoon. After using methamphetamine, the four men drove to a friend's deer camp where Currie and Melson believed they would consummate the drug transaction. After arriving at the secluded location around dusk, Green angrily confronted Currie about the earlier phone call to Manning and other matters. Currie denied ever saying he would rob Green and claimed that a mutual friend had stolen his phone. According to Green, Manning and Currie then got into a physical altercation and Manning shot Currie several times with a .38 revolver. Green admitted that he also shot at Currie with a sawed-off .410 shotgun when Currie was lying on the ground. He does not know, however, if his shots hit Currie.

Green and Manning considered shooting Melson as well, because Melson had witnessed Currie's murder. Instead, they gave one of the guns to Melson and forced him to shoot Currie, which in their minds incriminated Melson for Currie's murder. When Green and Manning turned away to get more ammunition, Melson fled in Currie's truck. He wrecked the truck, however, and ran through the brush to a nearby home to seek help. The homeowner called 911 around 10 p.m. and reported that Melson was banging on the door begging to come inside because someone was following and intending to shoot him. Melson told the Grimes County Sheriff's

deputy who responded to the call that Currie had been shot. The deputy thought Melson was high on narcotics and did not appear to take Melson's claim seriously.

After Melson fled the deer camp, Green and Manning loaded Currie into the back of Green's truck and looked for a place to dispose of the body. They eventually threw Currie's body into a ditch off a dirt road and returned to the deer camp to clean up and burn all evidence of the murder. Green and Manning then drove to Green's home where Green's alleged common-law wife, Mary Mariah Craig ("Craig"), had been waiting up for him.[2] It was late in the evening and Craig was getting ready for bed when Green arrived. When she pressed Green for information about where he had been, Green allegedly told Craig that he and Manning had just killed Currie. When Craig found out Manning and Green were leaving again, she insisted on going along because she wanted to spend time with Green. The three of them then left in Green's minivan and drove towards Manning's grandparents' home in the country. According to Craig, Manning wanted to show the property to Green for reasons unknown to her. By this time, calls and information were coming into the sheriff's office from various sources implicating Green and Manning in Currie's disappearance. According to Craig, Manning became nervous when he saw a police

---

[2] Green contends that he and Craig were common-law spouses at the time of the shooting and the record reflects that they often referred to one another as husband and wife when speaking to law enforcement. During the hearing on the motion to suppress and at trial, however, Craig denied that she was ever married to Green.

vehicle heading in the direction of Green's home and he opened the passenger-side door and threw a backpack out of the minivan.

After arriving at Manning's grandparents' home in the early morning hours, the trio drove around the property. One of the planks on a wooden trestle bridge they were trying to cross broke and the minivan became stuck on the bridge. Manning left Green and Craig behind with the minivan to get help. He called Mike Ferguson ("Ferguson") between 3 and 4 a.m. on June 26, 2016 and begged him to come and pull the van off the bridge. Ferguson and another man eventually arrived and freed the minivan. Manning, who had fallen asleep outside his grandparents' home, left in the minivan with Green. Craig, who left with Ferguson, returned home later that morning. Green left the county, but he eventually returned home that evening.

After Green returned home, Green and Craig retrieved Currie's body from the ditch, loaded it into the back of Green's truck, covered the body with various items, and then looked for a new place to dispose of the body. Green and Craig eventually left Currie's body in a creek bed on a ranch next to the Manning family property. They then burned additional items off the county road, near the ranch.

Captain Blake Jarvis ("Captain Jarvis"), Investigator Daniel Wagnon ("Investigator Wagnon"), and Investigator Kindale Pittman ("Investigator Pittman") of the Grimes County Sheriff's Office, as well as Ranger Jeff Owles with the Texas

5

Rangers ("Ranger Owles") and other law enforcement officials continued to investigate Currie's disappearance. They recovered Currie's wrecked truck and the backpack Manning had thrown out of the minivan, but they were unable to locate Currie. The backpack contained, among other things, a sawed-off .410 shotgun, shotgun shells, a handgun holster, and various clothing items.

On July 6, 2016, Green, Craig, and Ferguson[3] were arrested for theft of a tractor unrelated to Currie's murder. Captain Jarvis and Ranger Owles tried to interview Green when he was taken into custody on the theft charge. After advising Green of his rights under Article 38.22, Section 2(a) of the Texas Code of Criminal Procedure and *Miranda v. Arizona*, 384 U.S. 436 (1966)[4], Green invoked his right to counsel and the officers ended the interview. Later that day, Captain Jarvis and Ranger Owles interviewed Green at Green's request. The officers advised Green of his rights prior to the second interview and Green waived his rights. He agreed to speak with the officers and did not invoke his right to counsel.

---

[3]  After Captain Jarvis learned that Ferguson had a warrant for his arrest in another county, he approached Ferguson and asked him to wear a wire to obtain information from Green about Currie's disappearance. Captain Jarvis told Ferguson that he would help get the other case dismissed. Although Ferguson initially agreed to help, he ultimately decided not to go through with it, and he told Green about Captain Jarvis's plan. All of this occurred before Ferguson and Green were arrested for theft on July 6, 2016.

[4]  The warnings required by Article 38.22 include those articulated in *Miranda v. Arizona*, 384 U.S. 436 (1966), as well as a warning that the accused "has the right to terminate the interview at any time." TEX. CODE CRIM. PROC. art. 38.22, §§ 2(a), 3(a)(2); *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

6

On July 11, 2016, Craig, who was still in custody on the theft charge, went on a ride with Investigators Pittman and Wagnon to try to locate Currie's body. Craig became very upset on the ride back to the jail and repeatedly asked the investigators to let her speak with Green. A recording of Craig's conversation with the officers was admitted into evidence during the suppression hearing. Investigators Pittman and Wagnon conveyed her request to Captain Jarvis, and he agreed to facilitate a meeting between Craig and Green.

That same day, Craig and Green met in one of the interview rooms equipped with audio and video recording. When asked why she wanted to talk to Green, Craig testified at the suppression hearing: "Because I wanted Danny to confess. I wanted him to admit. I wanted to be done with the whole situation. I wanted to be able to go home. I just wanted to be -- I wanted it to end." Craig also testified that Captain Jarvis, Investigator Wagnon, and Investigator Pittman did not promise her anything to get her to speak with Green or request that she ask any specific questions of Green. She also denied having any agreement with them to elicit information from Green that they could use in their investigation.

Captain Jarvis testified that he did not ask Craig to ask Green any specific questions or give her instructions about the meeting. He denied promising Craig anything to get her to speak to Green. Captain Jarvis also stated that he did not promise Green or Craig they would have privacy in the interview room, and Green

7

and Craig knew or should have known based on prior interviews that their conversations in that room could be recorded. Investigator Pittman testified that it was Craig's idea to meet with Green. Investigator Pittman also stated that neither he nor Investigator Wagnon asked Craig to talk to Green. He also testified that he did not request Craig to ask Green any questions about Currie's murder or any other matter. He also denied promising Craig anything to meet with Green or having any kind of agreement with Craig to act as an agent of the State to elicit information from Green for the investigation.

Investigators Pittman and Wagnon tried to interview Green right after his meeting with Craig. Investigator Pittman, however, acknowledged at the suppression hearing that the officers did not advise Green of his rights before speaking with him on July 11, 2016. The interview was included on the same recording as Green's and Craig's conversation, and the entire recording was admitted into evidence for purposes of the suppression hearing without objection. No evidence regarding Investigators Pittman's and Wagnon's July 11, 2016 interview with Green was admitted at trial.

On July 13, 2016, Captain Jarvis learned that someone was trying to post bond for Green and Captain Jarvis conveyed this information to Craig. According to Craig, Captain Jarvis told her that if she helped them locate Currie's body, he would help get her released on a personal recognizance bond and she could go home to her

kids. Craig led investigators to Currie's remains later that day. She also led them to the first location where Green and Manning had disposed of Currie's body. Craig was released on a personal recognizance bond and set up with a motel room for a few days and money for clothes and food. Green called Craig from jail multiple times after her release. Four calls in which Green made inculpatory statements to Craig about Currie's murder were admitted into evidence.

Captain Jarvis tried to meet with Green again on July 14, 2016, after they found what they believed to be Currie's body, but Green invoked his right to counsel, and Captain Jarvis ended the interview. On July 18, 2016, Captain Jarvis brought Green back to the interview room. Captain Jarvis told Green that Craig had called him over the weekend to let him know that Green wanted to talk to him. Green confirmed that he had requested to talk to Captain Jarvis. Green told Captain Jarvis that he had spoken with Craig on the phone, and she had convinced him to ask for the meeting. Captain Jarvis then read Green his rights under Article 38.22 and *Miranda*. Green waived those rights, agreed to speak to Captain Jarvis, and did not invoke any of his rights. He confessed to Currie's murder. A recording of Green's confession and a transcript of the interview were admitted into evidence at trial.

## Motion to Suppress

In his first issue, Green argues that the trial court abused its discretion by denying his motion to suppress incriminating statements he made to law

enforcement and Craig. According to Green, the statements were not made freely and voluntarily and thus their admission violated Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure.[5] Green contends that Craig was acting as an agent of the State and coerced him to confess. According to Green, Craig induced him to make incriminating statements to law enforcement while he was in custody.

## A.    Standard of Review

"A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court's ruling should be reversed only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Thus, the judge may believe or disbelieve all or any part of a witness's testimony even if that testimony is uncontroverted. *Id.* This is so because it is the trial court that observes firsthand the demeanor and appearance of a witness, unlike an appellate court, which can only

---

[5]    Green also argued at trial that the statements were subject to spousal privilege pursuant to Rule 504 of the Texas Rules of Evidence. On appeal, however, Green acknowledges that either spouse may waive the privilege and even if Craig is his wife, he could not prevent her from testifying about their conversations.

10

read an impersonal record. *Id.* Although we generally limit our review to evidence introduced at the suppression hearing, when the parties later re-litigate the suppression issue at the trial on the merits, we consider all evidence, from both the pre-trial hearing and the trial, in our review of the trial court's determination. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

## B.    Applicable Law

The United States Constitution and the Texas Code of Criminal Procedure prohibit the use of statements made by a criminal defendant against himself if procured through custodial interrogation without the necessary procedural safeguards to secure the Fifth Amendment right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003); TEX. CRIM. APP. PROC. art. 38.22; *see also* TEX. CRIM. APP. PROC. art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."). The warnings that Article 38.22 requires include those articulated in *Miranda*, as well as a warning that the accused "has the right to terminate the interview at any time." TEX. CRIM. APP. PROC. art. 38.22, §§ 2(a), 3(a)(2); *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

The procedural safeguards of *Miranda* and Article 38.22 apply to custodial interrogation by law enforcement officers or their agents. *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005); *Hailey v. State*, 413 S.W.3d 457, 474 (Tex. App.—Fort Worth 2012, pet. ref'd). "Custodial interrogation" involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

Private citizens ordinarily are not considered law enforcement officers and thus cannot engage in custodial interrogation under Article 38.22. *See Hailey*, 413 S.W.3d at 474. A citizen who acts as an agent of law enforcement and interrogates a person in custody, however, is "bound by all constitutional and statutory confession rules, including *Miranda* and Article 38.22." *Wilkerson*, 173 S.W.3d at 529–30. In this context, "[t]he term 'agency' denotes a consensual relationship which exists between two persons or parties where one of them is acting for or on behalf of the other." *Id*. at 529. The law does not presume an agency relationship, and the person alleging its existence has the burden of proving it. *Id.* When considering whether information from a criminal defendant was procured by a person acting as a government agent, courts must determine whether the person acted pursuant to an agreement with or instructions from a known "government agent." *Manns v. State*, 122 S.W.3d 171, 182 (Tex. Crim. App. 2003). The person

12

who procured the challenged information will not be considered a government agent absent agreement or instruction predating procurement of the information. *Id.*

## C.    Analysis

Green confessed to Currie's murder when he met with Captain Jarvis on July 18, 2016. The record reflects that Green, who had requested the meeting with Captain Jarvis through Craig, waived his rights and agreed to speak with Captain Jarvis. Green argues on appeal that his statements to Captain Jarvis were not given freely and voluntarily because Craig coerced or induced him to confess and make incriminating statements to law enforcement. Green, however, does not explain how Craig allegedly coerced or induced him. Craig was not present during the July 18 interview, and she did not previously discuss the nature of the meeting or what would be discussed with Captain Jarvis. Green does not provide a factual basis for his assertions or identify any other reasons why his statements to Captain Jarvis were inadmissible.

Green also complains about the admission of incriminating statements uttered during certain phone calls with Craig. The record reflects that Green initiated each of those phone calls, not Craig, and that Green offered the incriminating statements voluntarily and not in response to questioning by Craig. Thus, Green's statements to Craig were not a product of custodial interrogation. *See Banargent v. State*, 228 S.W.3d 393, 402 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (holding

recordings of phone calls made by defendant from prison were not product of custodial interrogation); *State v. Scheineman*, 77 S.W.3d 810, 813 (Tex. Crim. App. 2002) (holding no custodial interrogation occurred when defendant's custodial statement was not made in response to interrogation by law enforcement personnel but instead was made when defendant was alone with co-defendant).[6]

Based on the record, we conclude that the trial court did not abuse its discretion by denying Green's motion to suppress his statements to Craig and Captain Jarvis.

We overrule Green's first issue.

### Admission of Evidence Jail

In his second and third issues, Green argues that the trial court abused its discretion by admitting audio recordings of telephone conversations between him and Craig while he was in custody and transcripts of those recordings, because the State did not properly authenticate the recordings.[7]

---

[6]   Green's statements to Craig on July 11, 2016 were not admitted into evidence or used in the State's case in chief.

[7]   Green further contends that the recordings and transcripts should not have been admitted because they contain incriminating statements that he made to Craig after Currie's body was discovered and Craig was acting as an agent of the State during the calls. We addressed the admissibility of these statements in our analysis of Green's first issue.

## A.    Standard of Review and Applicable Law

Texas Rule of Evidence 901 governs the authentication requirements for the admissibility of evidence. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). The authentication requirement can be satisfied for a voice recording by, among other things, "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." *Id.* 901(b)(5); *see also Diamond v. State*, 496 S.W.3d 124, 141–42 (Tex. App.—Houston [14th Dist.] 2016, pet ref'd). Alternatively, the authentication requirement for some evidence, including business records, can be satisfied independently through Texas Rule of Evidence 902. *See* TEX. R. EVID. 902(10); *Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (stating evidence "may be authenticated under either [Rule 901(b)(1)-(10)] governing extrinsic evidence that satisfies authentication requirement or [Rule 902(1)-(10)] governing self-authentication and need not be authenticated under both").

We review a trial court's ruling on an authentication issue under an abuse of discretion standard. *Fowler*, 544 S.W.3d at 848. We will uphold a trial court's

admissibility decision when that decision is within the zone of reasonable disagreement. *Id.* The trial court does not abuse its discretion in admitting evidence when it reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified. *See id.* at 848–49. Under this liberal standard, "it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Id.* (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)).

## B.  Analysis

Lt. Daniel Caswell ("Lt. Caswell"), the Grimes County Jail administrator, testified that he is the records keeper for the Grimes County Sheriff's Office and the custodian of records for all calls placed over the inmate telephone system. Lt. Caswell testified that the calls are kept in the normal, ordinary course of business, but they are not maintained by the county. Instead, the county uses a private vendor, NCIC Inmate Phone Systems, to manage its inmate telephone systems. According to Lt. Caswell, the vendor provides the operating systems, hardware, software, and all the equipment. The vendor maintains all the records for the county. Lt. Caswell also testified that he is familiar with the jail phone call recoding system, and that the recording equipment was in good working order in June and July 2016.

16

Lt. Caswell testified that each inmate has a unique personal identification, assigned to them upon arrival at the jail, and the inmate must use that number to access the phone system. Lt. Caswell, who can log directly into the inmate phone system maintained by NCIC from his computer, located four phone calls associated with Green's personal identification number. Lt. Caswell listened to the recordings of the calls and downloaded the recordings onto separate DVDs, which were admitted into evidence as State's Exhibits 164 to 167. Lt. Caswell initialed each DVD. Lt. Caswell testified that he listened to the four phone calls, and he recognized one of the voices on all four of the recordings to be that of Green.

Based on this evidence, we hold that the trial court's determination that the State supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic is within the zone of reasonable disagreement. Thus, the trial court did not abuse its discretion by admitting the audio recordings and their corresponding transcripts.[8] *Fowler*, 544 S.W.3d at 848–49.

We overrule Green's second and third issues.

---

[8] Having determined that the evidence is admissible under Rule 901, it is not necessary to address whether the evidence also satisfies the requirements for self-authentication under Rule 902. *See Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (stating evidence may be authenticated under either Rule 901 or 902 "and need not be authenticated under both").

17

**Admission of Expert Testimony and Demonstrative Evidence**

In his fourth issue, Green argues that the trial court abused its discretion by allowing Dr. Paula Brumit ("Dr. Brumit"), the State's forensic dental identification expert, to use a PowerPoint exhibit to testify about the process she used to determine that the skull recovered by police was Currie's, because her testimony and the exhibit included inadmissible evidence, namely, Currie's dental records from the Texas Department of Criminal Justice ("TDCJ"). Green argues that Currie's dental records from TDCJ are inadmissible hearsay.

Rule 703 of the Texas Rules of Evidence provides that "an expert may base [her] opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." TEX. R. EVID. 703. The rule clarifies that such facts or data need not be admissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Id.* The expert's disclosure of these facts and data, however, is subject to the same relevancy constraints that govern the admission of other kinds of evidence. *See* TEX. R. EVID. 705(d) ("If the underlying facts or data would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect."); *see also* TEX. R. EVID. 403.

Dr. Brumit testified that she is a forensic dentist and a practicing dentist with thirty-five years of experience. A forensic dentist is a dentist trained to assist law enforcement with the identification of human remains through dental examination. Dr. Brumit, who teaches forensic dental analysis at two universities, is the former chair of the forensic dentistry section of the American Academy of Forensic Sciences and has co-written several peer-reviewed articles on the topic. Dr. Brumit testified that forensic dentists identify the body of a deceased person by comparing dental records from that person to the dental records of a known person, typically, the decedent. She testified such dental records are the kind of evidence that experts in her field reasonably rely upon to make determinations of identification.

Dr. Brumit received digital images of the skull recovered by the sheriff's office, including photographs and x-rays of the decedent's skull, upper jaw, and maxilla, and she compared these dental records to Currie's antemortem (predeath) dental records. Dr. Brumit used a PowerPoint presentation with certain images to explain to the jury how she determined that the skull found in the creek in Grimes County, Texas was that of Currie. Green argues that the trial court abused its discretion by allowing the State to use the PowerPoint presentation because it

included inadmissible evidence, namely, Currie's antemortem dental records from TDCJ.[9]

Green's argument is unavailing. As noted, an expert may disclose the underlying facts or data relied upon, even if inadmissible, so long as experts in the field reasonably rely on such facts or data in forming an opinion on the subject. *See* TEX. R. EVID. 703 & 705(d). Based on Dr. Brumit's testimony, we conclude that trial court did not abuse its discretion in admitting Dr. Brumit's testimony. *See id*.

We overrule Green's fourth issue.

### Disqualification of Counsel

In his fifth issue, Green argues that the trial court abused its discretion by allowing Craig's appointed counsel, Mark Maltsberger ("Maltsberger"), to represent Craig at Green's trial even though Maltsberger had once represented Green in a criminal matter that the State was trying to use to enhance the applicable punishment range for Green. The record reveals that Maltsberger represented Green in a case involving two counts of burglary of a habitation in 2005.[10] Green, who was

---

[9] Green does not contend that Currie's dental records from TDCJ are more prejudicial than probative. And to the extent he attempts to raise a chain-of-custody issue on appeal, he does not support his contention with any argument, authority, or citations to the record and has therefore waived this issue. TEX. R. APP. P. 38.1(i) (appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

[10] *See Green v. State*, No. 10-05-00365-CR, 2006 WL 3627967 (Tex. App.—Waco Dec. 13, 2006, no pet.) (mem. op.).

sentenced to two terms of forty years' imprisonment to run concurrently for the 2005 burglary, was on parole for the offenses when Currie was murdered.

The State argues that Green waived this argument because he did not file a motion to disqualify Maltsberger and that even if he had filed such a motion and the trial court had denied it, he should have challenged the decision by filing a petition for writ of mandamus. *See In re Meza*, 611 S.W.3d 383, 385 (Tex. Crim. App. 2020) (reviewing denial of motion to disqualify filed in petition for writ of mandamus); *Vaughan v. Walther*, 875 S.W.2d 690, 690 (Tex. 1994) (orig. proceeding) (per curiam) (holding party who does not move to disqualify opposing counsel in timely manner waives complaint). Even if we assume, without deciding, that Green properly preserved the issue for appeal, Green still would not prevail.

## A.    Standard of Review and Applicable Law

A party moving for disqualification based on violation of a disciplinary rule must "establish with specificity" that the disciplinary rule was violated. *In re Thetford*, 574 S.W.3d 362, 373–74 (Tex. 2019). We review a trial court's refusal to disqualify a lawyer for abuse of discretion. *Id.* at 375. "A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles." *Id.* (quoting *In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (orig. proceeding)).

Green alleges that Maltsberger should have been disqualified because his representation of Craig violated Texas Disciplinary Rule of Professional Conduct 1.09. Rule 1.09 section (a) states:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

(1) in which such other person questions the validity of the lawyer's services or work product for the former client;

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

TEX. DISCIPLINARY RULES OF PROF'L CONDUCT 1.09(a).[11] Rule 1.09 does not absolutely prohibit a lawyer from representing a client against a former client. *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT 1.09 cmt. 3; *In re Chonody*, 49 S.W.3d 376, 379 (Tex. App.—Fort Worth 2000, no pet.).

The question under section(a)(2) of Rule 1.09 is whether Green established that Maltsberger's representation of Craig during Green's murder trial "in reasonable probability [would] involve a violation of Rule 1.05." Rule 1.05 protects confidences. Before a trial court may disqualify a lawyer under Rule 1.09(a)(2), the court must find a reasonable probability that some aspect of 1.05 will be violated.

---

[11] Green's counsel did not explicitly reference Rule 1.09 at trial.

22

Rule 1.05, referenced in Rule 1.09(a)(2), addresses a lawyer's duties with respect to a client's confidential information. Rule 1.05(b), pertinent to this action, provides:

> (b) [A] lawyer shall not knowingly:
>
> (1) Reveal confidential information of a client or a former client[.]
>
> * * *
>
> (3) Use confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

*Id.* 1.05(b)(1) & (3). "Confidential information" is defined as

> "[P]rivileged information" and "unprivileged client information." "Privileged information" refers to the information of a client protected by the lawyer-client privilege of Rule 503 of the Texas Rules of Evidence or of Rule 503 of the Texas Rules of Criminal Evidence. . . . "Unprivileged client information" means all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client.

*Id.* 1.05(a).

Because Maltsberger represented Green in the 2005 burglary cases, section(a)(3) of Rule 1.09 only prohibits Maltsberger from representing Craig in this case "if it is the same or a substantially related matter." *Id.* 1.09(a)(3). "[M]atters are substantially related when the similarity of the facts involved 'creates a genuine threat that confidences revealed to [the client's] former counsel will be divulged to his present adversary.'" *In re Thetford*, 574 S.W.3d at 374 (quoting *NCNB Tex. Nat. Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989)). "Neither conclusory statements

23

of similarities nor facial similarities will suffice—the movant must delineate specific facts that tie the former and current representations together." *In re Thetford*, 574 S.W.3d at 374.

## B. Analysis

At trial, Green's counsel objected to Craig testifying, arguing: "I believe there's a direct conflict of interest between [Maltsberger's] representation of Ms. Craig and his former representation of my client. And I would like that reflected in the record." Green's counsel explained that the conflict had arisen when Craig, who had referred to Green as her husband during the initial investigation, testified at the hearing on the motion to suppress that she did not consider herself married to Green and was not invoking spousal privilege. According to Green's counsel, "the conflict arises, Judge, where the testimony is adverse to my client and there's been legal advice given to Ms. Craig as to a particular legal issue, specifically the issue of marriage and common-law marriage by Mr. Maltsberger to Ms. Craig. And that legal advice is contrary to what's in the best representation of his former client Mr. Green."

Although Green identified the general subject matter at issue (the existence of a purported marriage between Green and Craig), he failed to demonstrate that the factual matters involved in his 2005 burglary case were so related to the facts in the present murder case that Maltsberger's representation of Craig created a genuine

threat that confidences Green revealed to Maltsberger during his representation of Green in 2005 would be divulged to Craig in 2016. *See In re Thetford*, 574 S.W.3d at 374. Green also did not offer any evidence that there is a "reasonable probability" that Maltsberger could reveal confidential information Green shared with him during the 2005 case.

We conclude that the trial court did not act in an unreasonable or arbitrary manner when it allowed Maltsberger to represent Craig, and therefore, the trial court did not abuse its discretion. *See id.* at 373–74.[12]

We overrule Green's fifth issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[12] We further note that Green's 2005 convictions for burglary of a habitation were only relevant as to the enhancements in the indictment for purposes of assessing his punishment, and that Craig did not testify at the punishment phase.

25